**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| **CERAMFAB, INC.,** | : | |
| **CERAMSOURCE, INC.,** | : | |
| **YONGGONG, LLC, and** | : | **COMPLAINT** |
| **WYG REFRACTORIES, LLC,** | : | |
| | : | **JURY TRIAL DEMANDED** |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **NORFOLK SOUTHERN** | : | |
| **CORPORATION, and NORFOLK** | : | |
| **SOUTHERN RAILWAY COMPANY,** | : | |
| | : | |
| **Defendants.** | : | |

## COMPLAINT

Plaintiffs CeramFab, Inc., CeramSource, Inc., Yonggong, LLC, and WYG Refractories, LLC (collectively "Plaintiffs"), by and through undersigned counsel, file this Complaint against Defendants Norfolk Southern Corporation and Norfolk Southern Railway Company and allege as follows:

## STATEMENT OF THE CASE

1.      Plaintiffs are businesses that share common ownership and were each located in East Palestine, Ohio at the time of the Norfolk Southern train derailment. Plaintiffs bring claims against Defendants arising from the derailment of a train hauling toxic chemicals in East Palestine, Ohio, on or about February 3, 2023 ("Derailment").  The resulting fire and release of toxic chemicals into the air, soil, and water have caused, and will continue to cause, direct and substantial damages to Plaintiffs.

2.      Plaintiff CeramFab, Inc. ("CeramFab") is an Ohio corporation with its principal place of business located  at  900 East Taggart Street,  East  Palestine,  Ohio 44413.

3.      Plaintiff CeramSource, Inc. ("CeramSource") is a New Jersey corporation with its principal place of business located  at  193 North James Street,  East  Palestine,  Ohio 44413.

4.      Plaintiff WYG Refractories, LLC ("WYG") is an Ohio corporation with its principal place of business located  at  193 North James Street,  East  Palestine,  Ohio 44413.

5.      Plaintiff Yonggong, LLC ("Yonggong") is an Ohio corporation with its principal place of business located  at  900 East Taggart Street,  East  Palestine,  Ohio 44413.

6.      Defendant Norfolk Southern Corporation ("NSC") is a Virginia corporation with its principal place of business in Atlanta, Georgia.

7.      Defendant Norfolk Southern Railway Company ("NSRC") is a Virginia corporation with its principal place of business in Atlanta, Georgia. NSRC is a wholly owned subsidiary of NSC.

8.      NSRC operates approximately 19,300 route miles (in 22 states and the District of Columbia) and serves every major container port in the eastern United States.

9.      According to the Federal Railroad Administration ("FRA"), NSRC had the most derailments of all railroad companies in Ohio from 2019 through 2022, with 67 accidents total— 22 in 2019, 18 in 2020, 15 in 2021 and 13 in 2022.

10.      According to the FRA, NSRC also had the most derailments of all railroad companies in Pennsylvania. This includes 74 total accidents (89.2% of all derailments in Pennsylvania) from 2019 to 2022—23 in 2019, 14 in 2020, 23 in 2021, and 14 in 2022.

11.      At all relevant times, NSC and NSRC acted individually, as well as by and through one another and their respective officers, directors, executives, employees, contractors, subcontractors, and/or agents. Collectively, Defendants NSC and NSRC will be identified as

2

"Norfolk," "Norfolk Southern," or "Defendants."

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action based upon 28 U.S.C. § 1332. Plaintiffs CeramFab, WYG, and Yonggong are citizens and residents of Ohio, and Plaintiff CeramSource is a citizen and resident of Ohio, Pennsylvania, and New Jersey. Defendants Norfolk Southern are both citizens of Virginia and Georgia. The amount in controversy herein exceeds the sum of $75,000, exclusive of interest and costs.

13.     Venue is appropriate in this Court in that a substantial part of the events, acts and omissions giving rise to the claims herein occurred in this district and division.

## FACTUAL ALLEGATIONS

**Norfolk's Implementation of "Precision Scheduled Railroading"**

14.     For approximately five years prior to the Derailment, Defendants had been implementing a number of operational changes that directly prioritized profits over safety through the use of a strategy known as "Precision Scheduled Railroading" ("PSR").

15.     While PSR is not defined by any specific list of required operational changes, PSR is associated with operational changes designed to increase efficiency in terms of operating costs relative to revenue. These operational changes associated with PSR include reductions in staff; longer, heavier trains; tighter schedules; and reductions in assets such as locomotives. At its core, the PSR mandates that trains should transport larger and heavier loads in less time with fewer workers performing onsite operation and safety procedures.

16.     In 2019, Norfolk laid out its three-year transformational plan to implement PSR (referred to as the "Thoroughbred Operating Plan" or "TOP21"). The TOP21 plan included centralizing operations; reducing staff; running fewer, heavier, faster trains; and optimizing Norfolk's network in order to increase efficiency.

17.     At its core, PSR was Norfolk's plan to cut jobs, cut costs, cut safety, and increase risks – all so Norfolk could increase their profits.

18.     Upon information and belief, these same or similar operating changes were in place at the time of the Derailment and subsequent explosion, particularly as several key metrics leading up to the Derailment showed a dramatic reduction in Norfolk Southern's workforce, a reduction in train engineers/operators, an increase in its trains' average speed, and a resulting sharp increase in company profits as these operational and safety cuts were enacted.

19.     Norfolk identified its "Operating Ratio" as the key metric to measure its progress. Operating Ratio was to be calculated by dividing its operating expenses by its operating revenues. In essence, Norfolk sought to significantly increase revenues by cutting otherwise reasonable safety and operational costs. Norfolk set a goal of reducing its Operating Ratio to 60% by 2021 (it was then running at 65.4%). Norfolk also changed its executive compensation in 2019, tying approximately 80% of the compensation to PSR objectives, including Norfolk's Operating Ratio.

20.     In furtherance of these goals, Norfolk executives set a tight deadline to complete its transition, namely, full PSR implementation by 2021. This required the railroad to cut headcount by 500 railway workers in 2019 and by 3,000 by 2021.

21.     In 2019, Norfolk put out a statement regarding its PSR overhaul stating, "[w]e set company records for train speed, which improved 17% year-over-year, and terminal dwell, which was down 30%[.]"

22.     According to Association of American Railroads ("AAR") and Surface Transportation Board "(STB") data, the average operating ratio for Class I railroads decreased from 73% in 2011 to 62% in 2021; reflecting an increase in net revenue of about 58%—from almost $18 billion to more than $28 billion—over that same period.

23.     By 2022, Norfolk Southern's had cut even deeper into its workforce, employing an

average of only about 19,000 railway workers compared with about 27,000 workers only 5 years earlier – a reduction of nearly 30% of its workforce.  These reductions directly and proximately resulted in reduced operational safety for Norfolk trains and increased risk to Plaintiffs.

24.     Norfolk's executives earned millions of dollars in awards as Norfolk's Operating Ratio and headcount dropped each year. In 2021, when Norfolk hit a record low Operating Ratio, it helped then-CEO Squires land nearly $3.5 million in cash bonuses – almost three times what he had earned just the year before. At least four other executives received more than a million dollars each in similar incentive-based bonuses, including the current CEO Shaw, who was an executive vice president at the time. Tellingly, in the Proxy Statement the Company filed with the SEC on March 31, 2022, Norfolk highlighted its 2021 "record performance for train length and weight" as partial justification for why [Norfolk] executives earned a cash payout that year.

25.     NSC has also issued Railroad Special Hazmat Instructions that govern the transportation and handling of hazardous materials by NSRC employees.

26.     NSC requires each NSRC employee who inspects or transports hazardous materials by rail to have a copy of and comply with the Railroad Special Hazmat Instructions.

27.     Upon information and belief, NSC's Railroad Special Hazmat Instructions were in place at the time of the train derailment and subsequent explosion.

**The Safety Concerns of PSR**

28.     For years, safety concerns have been building in the railroad industry as a result of PSR, the growing length of trains, and the industry's increased efforts to unreasonably reduce costs and headcount.

29.     Longer trains coupled with fewer personnel to inspect, maintain, and operate each train directly and proximately decrease operation safety and increase the potential for derailments. Employees have described a once reasonable system stretched beyond its limits, with one

employee expressing, "the workers are exhausted, times for car inspections have been drastically cut, and there are no regulations on the size of these trains."

30.     According to STB employment data, Norfolk reduced its workforce by 39% from 2011 through 2021, with most of that reduction occurring between 2019 and 2021.

31.     According to GAO, the largest percentage decrease was among "Maintenance of Equipment and Stores" employees, which includes mechanical staff, such as foremen, carmen, and mechanist, who are responsible for the maintenance of equipment, including railcars and locomotives. The next largest percentage decrease was among "Transportation (Other than Train and Engine) employees, which include train dispatchers, crew dispatchers, and railyard supervisors (called yardmasters).

32.     Norfolk's decision to adopt PSR likewise contributed to them cutting the use of signalmen to install, repair, and maintain signal systems, which railroads use to direct trains from one location to the next safely and on time.

33.     These same signalmen are responsible for inspecting, maintaining, and repairing wayside detectors like "hot-box" detectors, which alert operators to equipment failures while the train is in operation.

34.     In fact, under Norfolk's PSR program, Defendants have no such signalmen employed in or around the area of East Palestine, Ohio.

35.     In 2022, GAO reported that all seven Class I railroads stated they ran longer trains with the underlying goal of increasing operational efficiency. For example, according to one railroad, average train length has increased from 5,250 feet in 2011 to about 7,000 feet in 2021. According to another Class I railroad, the percentage of trains over 10,000 feet long has increased from less than 3 percent in 2017 to more than 25 percent in 2021. According to a third railroad, while the average train length has increased from about 6,300 feet in 2019 to nearly 7,000 feet in

2021, the percentage of trains over 10,000 feet has increased from 0.2 percent to about 5 percent during that timeframe.[1]

36.     As Norfolk has aggressively implemented its PSR program over the previous four years, Norfolk's Federal Railroad Administration ("FRA") train accident rate has likewise increased. In December 2022, just two months before the Derailment here, GAO reported that Norfolk had hit a 10-year high with its accident rate in 2021. Similarly, Class I freight railroads suffered two derailments for every million miles traveled in 2022.

37.     The FRA reports that between January 2022 and May 2022, Norfolk suffered from significant safety violations including undercounting, inadequately observing rules failures, and failing to verify the performance of operational tests. FRA noted that "NS did not take immediate actions to remediate defective conditions" and that "these conditions have exposed crews to increased hazards, potential property damage, and injuries due to defective equipment knowingly left in service". Additionally, FRA identified a number of rail component defects, and warned Norfolk Southern that "when critical components are not maintained, there is an increased risk of sudden failure with catastrophic potential."

38.     According to data from the FRA, there were a total of 103 derailments in January 2023, and 11 were Norfolk derailments.

39.     Critics within the industry have stated that the Operating Margin incentivizes executives to cut costs at the expense of safety.[2]

40.     Steven Ditmeyer is among those who has connected the drive to lower operating costs – and thereby improve Operating Margin – directly to longer, more dangerous trains, stating: "The longer they make [the train], the per-car cost of labor is less. And the longer trains have

---

[1] GAO, RAIL SAFETY: *Freight Trains Are Getting Longer, and Additional Information Is Needed to Assess Their Impact*, GAO-19-443 (Washington, D.C.: May 30, 2019).
[2] According to Steven Ditmeyer, the former director of research and development at the FRA, "[r]ailroads are seeking to have that number be the smallest, lowest number possible." He explained, "[y]ou want to squeeze the costs and increase the revenues."

greater damage done, greater, larger pileups, fires and so on."

41.     After seeing how Norfolk's executive compensation rules could lead to large cash payouts by driving down the Operating Ratio by just a fraction of a percent, Jared Cassity (the safety director of SMART, the nation's largest railroad union) stated: "**You have these executives that are getting rewarded and so** the instructions keep coming down no matter what . . .. I want more and that's why you see the railroads saying that **the train length is going to continue to grow no matter what.**" (emphasis added)

**Norfolk Prioritized Profits Over Safety and Actively Lobbied to Block Reasonable Safety Precautions**

42.     As the railroad industry and Norfolk embraced PSR, Norfolk ramped up its lobbying efforts - including most notably in Columbus, Ohio - to prevent safety regulations that would increase costs and hamper the operating margins which were so closely tied to executive compensation and bonuses.

43.     Norfolk has spent tens of millions of dollars over the years lobbying state governments, Congress, and federal agencies by trying to block potentially costly safety reforms, including by opposing whistleblower protections and speed limits for ultrahazardous flammable trains. Additionally, Norfolk has opposed an ongoing federal effort to require a minimum number of crew members on a train. In December 2022, Norfolk reportedly told the FRA that running trains with just a one-person crew is safe.

44.     In 2015, Norfolk played a key role in defeating an Obama-era safety rule that was issued following a number of oil train accidents. The rule required trains carrying oil or other hazardous liquids to be equipped with electronically controlled pneumatic ("ECP") brakes on their rail cars ("ECP Brake Rule"). While air brakes stop train cars individually, as air pressure moves sequentially from one car to the next, ECP brakes operate using an electronic signal which can stop an entire train much faster. Notwithstanding the safety benefits, Norfolk retained 47 federal lobbyists

8

to fight against the ECP Brake Rule. Ultimately, the ECP Brake Rule was repealed in 2018.

45.     In Ohio alone, Norfolk has made over 100 contributions to Ohio state officials and candidates over the last 5 years, according to data from Ohio's secretary of state. Additionally, Norfolk has hired lobbyists to influence the course of legislation with Norfolk filing more than 200 state-required quarterly reports disclosing lobbying in the past 6 years.

46.     In Ohio, Norfolk employs the well-connected Columbus-based lobbying firm called The Success Group. Governor DeWine's former legislative director Dan McCarthy led the firm prior to joining the administration. McCarthy was later implicated in facilitating the bribery of the former Ohio House of Representatives Speaker Larry Householder, who was convicted of racketeering conspiracy for taking $60 million from Ohio utility First Energy to assist that company in passing House Bill 6. McCarthy resigned from the DeWine administration in September 2021. The Success Group began representing Norfolk in 2009. Since then, Norfolk's lobbyists have repeatedly fended off legislation imposing a minimum staffing requirement of a 2-person crew or penalties for blocked railroad crossings.

**Derailment of Train 32N**

47.     On Friday February 3, 2023, Norfolk Southern Freight Train 32N ("Train 32N") was traveling from Madison County, Illinois to Conway, Pennsylvania.

48.     Upon information and belief, multiple safety issues occurred on Train 32N that evening and were either undetected or ignored by Defendants' employees.

49.     Notably, a VICE article published after the Derailment entitled '32 Nasty': Rail Workers Say They Knew the Train That Derailed in East Palestine Was Dangerous, "two workers … said 32N in particular was a known safety risk." [3]

---

[3] Vice, *'32 Nasty:' Rail Workers Say They Knew the Train That Derailed in East Palestine Was Dangerous*, available at https://www.vice.com/en/article/88qze4/32-nasty-rail-workers-say-theyknew-the-train-that-derailed-in-east- palestine-was-dangerous (Feb. 15, 2023) (last visited Oct 6, 2023).

50.     These two workers told VICE that "multiple red flags, including two mechanical problems, about 32N went undetected or were ignored in the hours leading up to the crash."

51.     Defendants' rail lines operate a hot bearing detector ("HBD"), that transmits an audible alarm to the train crew to slow and/or stop the train to inspect a hot axel.

52.     A wheel bearing from Train 32N's 23rd rail car recorded a temperature of 38 degrees Fahrenheit above ambient temperature at mile post 79.9.

53.     The next HBD Train 32N passed at mile post 69.01 recorded that the same bearing's temperature had reached 103 degrees Fahrenheit above ambient temperature.

54.     As Train 32N passed the third HBD at mile post 49.81, the wheel bearing on rail car 23 reached a temperature of 253 degrees Fahrenheit above ambient temperature. According to Defendants' own policies, any reading above 170 degrees Fahrenheit requires the train crew to stop the train. Defendants considers any reading over 200 degrees "critical."

55.     Video footage from around this same time caught one of the rail cars of Train 32N sparking in the wheel bearing and axle area. A former Norfolk train engineer who viewed the video explained: "That was a tell-tell sign 'cause there's so much pressure, so much on that bearing, it won't last long sparking that hot that much.'"

56.     Before the full train derailment took place, a mechanical defect alarm alerted the crew members of the malfunctioning railcar axle. In addition, Train 32N had broken down at least once prior to the wheel bearing overheating on the same evening on this same route.

57.     An emergency brake was also applied after the workers on Train 32N finally became aware of these malfunctions but before the full Derailment occurred.

58.     Around 8:55 p.m. on February 3, 2023, the overheated wheel bearing caused rail car 23's axel to fail, derailing the car and causing approximately 40 of the other train cars to derail with it in or near East Palestine, Ohio ("Derailment").

59.    Approximately 11 of the derailed rail cars were carrying abnormally dangerous and/or ultrahazardous chemicals that are known to be carcinogens by the Environmental Protection Agency ("EPA") including, but not limited to, polyvinyl, polyethylene, vinyl chloride, ethylene glycol monobutyl ether, ethylhexyl acrylate, isobutylene, benzene, and butyl acrylates ("Toxic Chemicals").

60.    According to employees familiar with this matter, there had been widespread concerns that night among those working on Train 32N regarding the train's excessive length and weight – approximately 151 cars, 9,300 feet long, and 18,000 tons. Additionally, Train 32N was backloaded with 40% of its weight, the heaviest tanker cars, at the rear.

61.    Through information and belief, Norfolk Southern was aware of the increased risks of a dangerous event occurring with Train 32N prior to its derailment, but intentionally acted – and instructed others to act – in a manner that violated its own internal safety or operating procedures.

62.    Through information and belief, Norfolk Southern was aware – and had advance notice – that the personnel working on Train N32 were not adequately prepared to mitigate or prevent the derailment on February 3, 2023, or to comply with the companies' own internal or outwardly stated safety protocols.

63.    All of these factors contributed to both the initial breakdown and the Derailment.

64.    The immediate result of the Derailment was that millions of pounds of Toxic Chemicals were spilled into the air, soil, and water – including directly onto Plaintiffs' properties.

**Norfolk's Response Compounded the Derailment's Harm**

65.    Norfolk failed to report the Derailment to federal authorities until two hours after the Derailment at approximately 10:53 p.m., in violation of applicable federal regulations. *See* C.F.R. § 225.9(a)(2)(iv).

66.    Following the Derailment on the evening of Friday, February 3, 2023, the fire created by the burning railcars and their contents was large enough to be detected by the Pittsburgh, Pennsylvania weather radar approximately 50 miles away for several hours. The fire's intensity appeared to peak at approximately 10:40 PM, and the resulting smoke plume in the immediate aftermath traveled at least as far as Beaver Falls, Pennsylvania.

67.    Defendants failed to promptly inform firefighters and other first responders of the hazardous contents of many rail cars on Train 32N. This lack of information impeded first responders' response, preventing them from extinguishing the fire and allowing it to rapidly spread.

68.    The fire continued to burn with increasing intensity for the next few days on Saturday (February 4, 2023), Sunday (February 5, 2023), and/or Monday (February 6, 2023).

69.    On or about Saturday February 4, 2023, government officials issued an evacuation order for residents within a one-mile by two-mile radius of the Derailment Site ("Danger Zone") affecting thousands of residents.

70.    On or about Sunday February 6, 2023, residents of Mahoning County and other surrounding communities were advised to stay indoors and shelter in place.

71.    The railcars containing the Toxic Chemicals were equipped with emergency valves to vent the contents and relieve pressure, but multiple of these valves malfunctioned as a result of poor maintenance by the Defendants.

72.    On Sunday and/or Monday (February 5-6, 2023), there was an increase in temperature and pressure within one of the railcars containing vinyl chloride due to malfunctioning safety valves. This increased the potential of catastrophic tanker failure and an explosion.

**Norfolk's Controlled Burn Caused Widespread Contamination**

73.     Upon information and belief, NSC and NSRC reported to federal, state, and local officials that the only way to avoid a catastrophic tanker failure and explosion was to conduct a "controlled release" of the vinyl chloride in the compromised tanker.

74.     Before conducting this "controlled burn," and well after the train had derailed, Defendants' response team made the decision to disregarded materially relevant statements from third parties about the contents of the railcars and their current state in undertaking the "controlled" vent and burn of the vinyl chloride.  This "controlled burn" decision, and all subsequent recommendations made and/or instructions given by Defendants regarding the derailed Train N32, would end up independently being direct and proximate causes of Plaintiffs' damages.

75.     On or about Monday February 6, 2023, at approximately 4:30 p.m., Defendants intentionally blew holes in each of the derailed cars containing vinyl chloride to drain the chemical into a trench where flares would then ignite and burn the vinyl chloride away ("Controlled Release").

76.     Following the Controlled Release, a large plume of thick black smoke formed a mushroom-like cloud, which dispersed the Toxic Chemicals into the environment ("Controlled Burn"), causing further contamination and exposure.

77.     Defendants failed to investigate possible alternatives to the Controlled Burn, instead choosing to pursue the course that would allow the railroad to re-open as quickly as possible, regardless of the consequences to Plaintiffs and the East Palestine community. The failure to timely convey information to authorities as described above also prevented the evaluation and exploration of safer alternatives to the Controlled Burn.

78.     During the resulting multi-day fire, at least three railcars containing diethylene glycol broke open and discharged into the surrounding environment.



79.     The smoke from the Controlled Release and ongoing railcar fires was trapped from rising higher into the atmosphere due to an inversion layer at approximately 3,000 feet, resulting in the toxic plume of thick, billowing smoke that spread out horizontally through East Palestine and neighboring towns. This effect is shown clearly in the picture above taken during the Controlled Release and Burn.

80.     The expected heat generated by this burn would have exceeded 2,000 degrees.  The residues, gases, and vapors produced by the fire at this temperature are Products of Incomplete Combustion (PIC) that would have included particle matter (PM), polycyclic aromatic hydrocarbons (PAHs), carbon dioxide, carbon monoxide, heavy metals, dioxins, and other complex chemical compounds related to the constituents which were burned out of the derailed Train N32 cars.

81.     The extreme heat from Defendants' "controlled burn" then drove PICs into building infrastructures as heat expanded or opened the surface. Cooling then locked in the PICs. This heat was so extreme that it would cause increased particle vibration and force acceleration into and

through the walls of proximate structures immediate adjacent to the derailment – such as the CeramFab facilities – as well as those other structures directly down the rail line and less than ½ mile away – such as the WYG and CeramSource buildings. Often heat damage and PIC deposits of this type do not manifest themselves until the structure is entirely removed.

82.     In Youngstown, Ohio – more than 20 miles from the Derailment Site – an EPA airborne particulate pollution monitor detected a greater than five-fold increase in the concentration of fine particulate matter during the time of the Controlled Burn.

83.     Following the completion of the burn, previously evacuated residents and businesses were given the "all clear" for return by Thursday, February 9, 2023.

84.     On February 10, 2023, the EPA stated that the Derailment and subsequent fire and Controlled Burn released, and continues to release, including but not limited to, vinyl chloride, butyl acrylate, ethylhexyl acrylate, and ethylene glycol monobutyl ethers to the air, surface soil, and surface waters.

**The Toxic Chemicals Released are Extremely Hazardous to Human Health**

85.     Vinyl chloride is classified by the Department of Health and Human Services as known to be a carcinogen. The EPA has classified it as a Group A human carcinogenic – the most dangerous to human health – by the inhalation, oral, and dermal routes of exposure. Short-term exposure to vinyl chloride can cause, including but not limited to, dizziness, nausea, headaches, difficulty breathing, lung irritation, chest pains, coughing, eye irritation, loss of consciousness. Vinyl chloride exposure also creates an increased risk of a rare form of liver cancer (hepatic angiosarcoma), as well as primary liver cancer (hepatocellular carcinoma), brain and lung cancers, lymphoma, and leukemia. When vinyl chloride burns, it decomposes into hydrogen chloride and phosgene. "Phosgene is highly poisonous and was used extensively during World War I as a

choking agent, while hydrogen chloride is irritating and corrosive to any tissue with which it comes

into contact." According to the National Transportation Safety Board ("NTSB"):

> Vinyl chloride is a colorless gas with a mild, sweet odor that is used to make polyvinyl chloride ("PVC"). It is a gas at room temperature; however, it is shipped as a liquid under pressure. It is highly flammable and vapor/air mixtures are explosive. The odor threshold for detection is about 3,000 parts per million (ppm) in air. The Occupational Safety and Health Administration ("OSHA") regulates occupational exposures to vinyl chloride under 29 CFR 1910.1017. Paragraph C of the standard mandates that no employee may be exposed to vinyl chloride at concentrations greater than 1 ppm averaged over any 8-hour period; no employee may be exposed at concentrations greater than 5 ppm averaged over any period not exceeding 15 minutes; and that no employee may be exposed to vinyl chloride by direct contact with liquid vinyl chloride. Due to the significant difference between the odor threshold and the acceptable occupational exposure levels, workers can easily be overexposed without becoming aware of vinyl chloride's presence. The odor threshold is too high to provide adequate warning for hazardous conditions.

86.    Butyl acrylate is a clear colorless liquid with a sharp characteristic odor. It is used to

manufacture paints, sealants, and adhesives. Exposure can cause irritation of the eyes, skin, and

upper respiratory system.

87.    Ethylhexyl acrylate is a colorless liquid used to manufacture paints and plastics.

Exposure by inhalation or absorption through the skin can irritate and burn the skin, eyes, nose,

throat, and lungs and can cause dizziness, nausea, drowsiness, and headaches.

88.    Ethylene glycol monobutyl ether is a colorless, toxic, flammable liquid used to

manufacture paints and varnishes. Its vapors are heavier than air and will spread along the ground

and collect in low or confined areas such as sewers and basements. Exposure by inhalation or

absorption through the skin can irritate the eyes and nose and can cause dizziness, nausea,

vomiting, and headaches.

89.    Isobutylene is a colorless, highly flammable gas. Exposure by inhalation or

absorption through the skin can cause irritation, dizziness, drowsiness, and unconsciousness.

90.    Benzene is a colorless or yellow liquid that is highly flammable, dissolves slightly in water, has a sweet odor, and evaporates in the air very quickly. The EPA has classified it as a known carcinogen. Short-term exposure to high levels of benzene can cause drowsiness, dizziness, unconsciousness, and death. Long-term exposure increases the risk of developing lymphatic and hematopoietic cancers, acute myelogenous leukemia, as well as chronic lymphocytic leukemia. OSHA has set limits of 1 part benzene per million (1 ppm) part of workspace air for 8-hour shifts and 40-hour work weeks.

91.    In addition to the hazardous chemicals carried on Train 32N, the derailment and resulting burning of the cars and their carried chemicals resulted in the creation and/or release of additional constituents and hazardous substances which directly impacted Plaintiffs' property.

92.    Aldehydes, including but not limited to Formaldehyde, were created and/or released into the environment – and onto Plaintiffs' property – by the Train 32N derailment and the burning of the derailed tanker chemicals. Formaldehyde is a compound with the formula $CH_2O$ and structure $H-CHO$. The pure compound is a pungent, colorless gas that polymerizes spontaneously into paraformaldehyde. The International Agency for Research on Cancer (IARC) classifies formaldehyde as a human carcinogen. In 2011, the National Toxicology Program, an interagency program of the Department of Health and Human Services, named formaldehyde as a known human carcinogen in its 12th Report on Carcinogens.

93.    Polyaromatic hydrocarbons (PAHs), including benzo(a)pyrene, were created and/or released into the environment – and onto Plaintiffs' property – by the Train 32N derailment and the burning of the derailed tanker chemicals. PAHs generally have a high degree of acute toxicity in humans and have been associated with increased incidences of lung, skin, and bladder cancers from occupational exposures. It has been scientifically established that PAHs, after metabolic activation

in vivo, are capable of inducing mutations in oncogenes and, by inducing multiple mutations, may result in tumors.

94.    Phthalates, including Bis(2-ethylhexyl)phthalates (DEHP), were created and/or released into the environment – and onto Plaintiffs' property – by the Train 32N derailment and the burning of the derailed tanker chemicals. Phthalates are a series of chemical substances, which are mainly used as plasticizers and can potentially disrupt the endocrine system. Animal studies have demonstrated that DEHP exposure resulted in liver cancer in rats and mice. The Department of Health and Human Services (DHHS) has determined that DEHP may reasonably be anticipated to be a human carcinogen. EPA has determined that DEHP is a probable human carcinogen.

95.    Dioxins were created and/or released into the environment – and onto Plaintiffs' property – by the Train 32N derailment and the burning of the vinyl chloride from derailed cars. Dioxins are "white crystalline needles" that are invisible to the eyes and generally disperse and attach to soil and dust particles. Dioxins are highly toxic and carcinogenic, and they can also cause reproductive and developmental problems, damage to the immune system, and can disrupt normal hormonal function. As put by a Carnegie Mellon University Chemistry Professor: "[v]inyl chloride is bad, dioxins are worse" as dioxins are persistent environmental pollutants that may last in the ground for 60-80 years.

96.    Petroleum or gasoline constituents (including ethylbenzene, toluene, and xylenes) and chlorinated solvents (tetrachloroethylene) were created and/or released into the environment – and onto Plaintiffs' property – by the Train 32N derailment and the burning of chemicals from the derailed tankers. Ethylbenzene may cause cancer in humans. It causes tumors in the kidneys, lungs, and liver of animals as well as severe inner ear damage. Exposure to toluene can cause eye and nose irritation, tiredness, confusion, euphoria, dizziness, headache, dilated pupils, tears, anxiety, muscle fatigue, insomnia, nerve damage, inflammation of the skin, and liver and kidney damage.

Exposure to xylene can irritate the eyes, nose, skin, and throat. Xylene can also cause headaches, dizziness, confusion, loss of muscle coordination, and in high doses, death. The Center for Disease Control (CDC) states individuals may be harmed from exposure to toluene. Tetrachloroethylene is a colorless liquid with a mild, chloroform-like odor. Exposure to tetrachloroethylene may cause irritation of the eyes, skin, nose, throat, and respiratory system. It may also cause liver damage and is a potential occupational carcinogen.

**Plaintiffs Have Suffered Catastrophic Losses from the Derailment and Burn**

97.    All Plaintiff businesses are majority owned by a single individual – Edwin Wang.

98.    Mr. Wang immigrated to the United States from China in 1992 along with his wife and young daughter. Mr. Wang then spent the next six years working for a bearings manufacturer in California while obtaining his green card and saving enough funds to start his own business.

99.    In 1999, Mr. Wang moved to New Jersey and founded what would later become CeramSource.

100.    CeramSource carries a large inventory of stock in ceramic fiber insulation products (such as ceramic fiber blankets, paper, boards, textiles, modules), insulation fire bricks, and carbon sheets for high temperature industries such as steel mills, foundries, refineries, glass makers, aluminum casting facilities, boiler making companies, furnace making factories, ceramics firers, and many other high temperature related industries. The ceramic fiber products that CeramSource sells were traditionally all made internationally and shipped to the United States, with some being perishable in nature.

101.    Over its first two decades in operation, Mr. Wang built CeramSource from the ground up, ultimately achieving over $3.6 million in annual revenue in 2018 and creating numerous jobs for his community.

102.    Prior to the Derailment and after 24 years of operation in the United States, CeramSource had established relationships with over 500 customer accounts, and as CeramSource's business operations grew, its customers' expectations became increasingly sophisticated.

103.    For example, many customers began requesting that CeramSource customize the grades, shapes, and sizes of its products instead of just supplying standard grades and dimensions. There was also a steady push over the last half decade for more "made in the USA" aspects to be incorporated into the supply chain.

104.    These changing dynamics resulted in Mr. Wang making a significant strategic pivot. At the end of 2018, Mr. Wang chose to relocate his business from New Jersey to East Palestine, Ohio to be closer to his customers and because there were vacant industrial spaces available for him to expand from just wholesaling refractory products with CeramSource to actually manufacturing them himself with CeramFab and WYG Refractories.

105.    In addition, the move to East Palestine, Ohio would allow all three businesses to be near each other to maximize efficiencies, which would result in all three businesses operating more seamlessly and more profitably. In the process, Mr. Wang purchased and revitalized multiple dilapidated properties in East Palestine while providing good, well-paying jobs for several dozen individuals.

106.    Plaintiff CeramFab was founded in 2019 to manufacture and sell ceramic refractory products. CeramFab purchased its current building in East Palestine, Ohio in 2019, and for the next three years, the company completed an extensive remodel of the facility. This remodel was a significant expansion and upgrade of the original CeramSource business model. CeramFab could supply a nearly unlimited, diverse range of ceramic fiber insulation products and could produce various shapes and sizes of ceramic fiber insulation products through a casting process which uses

20

dies and vacuum forming techniques. The type of fabrication done at CeramFab required a facility which would meet certain space and lay-out thresholds in which the essential equipment and production lines would be run.







107.    CeramFab's first production line was completed by the end of 2021 and phased into its initial production in 2022 with a plan to reach six production lines with two shifts daily by 2025. By the end of 2022, even with only one production line running one shift daily, CeramFab had

$1,340,612 in revenue. Continuing this successful growth trend, in January 2023 alone, CeramFab had $197,609.05 in revenue and was on track to achieve $4,000,000 in revenue by 2023 year-end with further continued production lines being simultaneously implemented. In 2024, CeramFab would have completed its production line expansion plans and was projected to have $12,000,000 in sales by year end. By 2025, CeramFab would have completed its production scaling plans by permanently running multiple shifts on all lines (bringing the total to six production lines with two shifts). But for Defendants' tortious conduct, CeramFab's end of year sales for 2025, were projected to reach $18,000,000 in annual revenue – with no foreseeable future interruption in business operations or sales.

108.    Plaintiff WYG was founded in 2019 because of high demand from CeramSource's steel mill and foundry customers who have been using the ceramic fiber products supplied by CeramSource for many years and were looking for suppliers who could offer all the product lines which they might need. CeramSource's main products are magnesia carbon bricks and mortars, which are high end refractory materials used in steel mills and various alloy-casting foundries for lining furnaces, ladles, and tun dishes.

109.    Because of CeramSource's 24-year operating history, there were pre-existing relationships with customers who could use the mag carbon bricks and mortars produced by WYG and who were looking for a single supplier to source all their needs. WYG's operations were, therefore, a very valuable expansion of the original CeramSource revenue stream. As with CeramFab, however, the nature of the manufacturing done at WYG demanded a facility which would meet certain lay-out thresholds in which the required equipment and production lines would operate. This limited the potential factory and property options – especially when including the need for having all the companies proximately located.

110.    WYG purchased its current building in East Palestine, Ohio in 2019. When the East

22

Palestine location was initially chosen, it met the spacing requirements but was sorely in need of both structural repair and updating in order to be functionally operational.

111.    In addition to the obvious roofing, siding, electrical, plumbing, and structural updates which would have to be performed on any previously abandoned commercial site such as this, significant industry specific modification, equipment purchases, and capital investments were required. For the next three years, the company completed an extensive remodel of the facility and build-out of multiple production lines.



Figures. WYG Refractories – Press Installation Process Required Three Foundation Pits.



Figures. WYG Refractories – Installation of Initial Oven and Blocking for Second.

112.    In all, the structural improvements and operational equipment build-out for the WYG Refractories facilities took approximately three years and required over $5,100,000 in capital investments. By the end of 2022, WYG had completed its build-out, performed its trial production runs, and its bricks were successfully tested to meet industry and customer standards.



Figures. WYG Bricks Being Tested at Full Oven Temperature.



Figures. WYG Bricks Tested Successfully.

113.    Following the completion of its trial productions, WYG Refractories began production and fulfilling customer orders. Even Nucor Corp, the country's largest and most diversified producer of steel and steel products, had placed an initial $250,000 purchase order just prior to the February 3, 2023, derailment. That order ultimately had to be cancelled by WYG because of the derailment related work stoppage.



Figures. WYG Refractories – Production Begins.

114.    Just as with CeramFab, WYG still had significant room for growth. The present facilities were operating two presses and a single oven, but expansion plans included one more of each along with additional transportation tracks.  Plans were for the plant to be at 100% operational

capacity with multiple shifts by 2025.

115.    The additions of CeramFab and WYG served to expand the core business of CeramSource as well, allowing the company to offer more products to customers, and this shift was priming to work well for CeramSource.

116.    Within the first two years of the limited opening of just the CeramFab facility in East Palestine – prior to the February 3, 2023, derailment – CeramSource was already seeing a 25% increase in sales and a doubling of net income from approximately $850,000/yr. to over $1,780,000/yr. For example, in 2020, CeramSource had $5,707,522 in sales with a net income of $852,821, but after scaling its production due to the high demand for its products, CeramSource was able to increase its sales even further to $7,149,173 with a net income of $1,784,226 in 2022. CeramSource's revenues were continuing to increase in early 2023, and the business was on track to reach $7,500,000 by year end if not for the Derailment.

117.    The Derailment has devastated all four of Mr. Wang's businesses. Mr. Wang's businesses were within the immediate evacuation zone around the Controlled Burn., so all work was immediately halted at each facility. In addition, the heat from the fire forced toxic constituents resulting from the Controlled Burn into and through the walls of Plaintiffs' facilities.





118.    Once the evacuation order was lifted and authorities had given the "all clear" for employees in the area to return to work, numerous employees of Plaintiffs' businesses reported being ill and unable to work after spending only short periods of time in Plaintiffs' facilities. Additionally, even the employees who were able to report to work for longer periods of time experienced symptoms such as burning eyes, acute breathing problems, rashes, foul odors, tastes, and other strange effects directly caused by the Derailment and Controlled Burn.

119.    Unable to fully staff any shifts and concerned for the wellbeing of the employees, as well as the potential liabilities for exposing workers to a contaminated building, Mr. Wang made the difficult decision to temporarily cease operations at all three businesses because of concerns over the toxic constituents released during the Derailment and Controlled Burn.

120.    These concerns were further magnified – and the decision to keep the workers from the facilities supported – by the ever-increasing scope of the remediation and clean-up efforts being conducted by Norfolk Southern's contractors next to and on the CeramFab premises. Over the next few months, Defendants provided no clear indication on how long their clean-up efforts would take or how contaminated they knew Plaintiffs' business properties actually were. This lack of transparent communication from Norfolk Southern was coupled with multiple public third-party

reports of increased community dioxin levels and persistent contamination proximate to Plaintiff properties.

121.    Because of this, Plaintiffs hired their own environmental consultants who first tested the properties in late February 2023. Those test results revealed multiple areas of concern both inside and outside the facilities.

122.    First, at CeramFab, which was at the nexus of the contamination from the Derailment and Controlled Burn, the results from soil samples, bulk building samples, and the storm sewer sampling showed that higher than expected levels of volatile organic compounds (VOCs), polycyclic aromatic hydrocarbons (PAHs), phthalates, and dioxins were present. All of these chemicals can cause human health problems on both a short- and long-term basis, with conditions ranging from eye, nose, and throat irritation all the way to kidney and liver damage or cancer. The dioxin results in particular are alarming because they are known to persist for decades in soil, and most other mediums, without proper remediation.

123.    The samples taken from inside CeramFab's facility were equally concerning because of the presence of the resulting combustion products from the chemicals on the train - like phthalates, formaldehyde, and dioxins - being identified at high concentrations.

124.    Even though the WYG and CeramSource business property was about further down the tracks from CeramFab, the testing results were similar. There, both the soil and interior air filters and building surfaces also showed high levels of PAHs, phthalates, and dioxins.

125.    On September 7, 2023, Arcadis – Norfolk's East Palestine contractor – released its own work plan report that stated CeramFab was a known area with a potential for vapor intrusion of dangerous contaminants. The areas all around CeramFab's property were listed as being potentially contaminated, including the ground under the building, on the building, and the stormwater system.

126.    In addition to all the reasonable contamination fears, acute health reactions, and uncertainty surrounding the breadth of the contamination and clean-up which prevented employees of these businesses from returning to work, Defendants have also been actively and continuously using the CeramFab property for extensive clean-up operations since the February 3, 2023, derailment.

127.    Since Plaintiffs' property was ground zero for the Derailment and Controlled Burn, CeramFab's lot has been continuously used as a staging area for all the contract workers, their vehicles, and equipment. For instance, the work on the lot includes: 10-foot-deep survey holes excavated within three feet of CeramFab's walls; drainage ditches have been dug, filled, and re-dug along two sides of CeramFab's property and structures; the entire lot's surface soil has been stripped; potholing on the north side of the building has been bored to identify the depth and extent of the foundation and contamination; and piping has been excavated for rerouting storm water into collection piping.



 



 

128.    The work by Defendants also resulted in flooding of the loading docks, which required over 3,000 gallons of flood water to be pumped out of the building on June 27, 2023.



129.    This flooding has since recurred multiple times with the structural damage from Norfolk's work being so persistently damaging that there are now cracks in the concrete of the CeramFab building which weep water directly into the building as well as damage to and around the building foundation and drainage systems.

130.    Over the past nine months, Defendants have not provided Mr. Wang any clear indications on how long the clean-up will take or the full extent of the harm caused to the Plaintiffs' properties. This continued uncertainty has significantly hampered Mr. Wang's abilities to mitigate the continuing financial losses his businesses have been suffering or to develop a confident path forward in East Palestine.

131.    All of this – the initial derailment, the national spotlight, the continued clean-up, and the operational shutdown – has also eroded the confidence of both existing customers and potential future customers from engaging with the three companies. There is a palpable taint on everything now related to East Palestine. It comes up in every sales call with every customer. Some customers do not want existing product from East Palestine because of a perceived contamination risk. Others do not want the headaches of placing future orders because of the fear that further remediation will

be required that will prolong the companies' operational hiatus, force future closures, or result in new facility remediation.

132.    For example, CeramFab had its first customer order cancellation – more than $475,000 – within just weeks of the Derailment event. Other cancellations rapidly followed once it was evident that CeramFab would not be able to timely fill purchase orders.

133.    These ongoing uncertainties surrounding the Derailment forced Plaintiffs WYG and CeramFab to inform all employees that their employment would be terminated as of July 1, 2023 and there was no timetable for determining when, or if, the companies will be able to reopen in East Palestine, Ohio.

134.    The creation of the CeramFab and WYG entities was always meant to make them profitable revenue generators in their own rights but was also a vehicle for further enhancing and expanding the CeramSource net profit profile. In just two years since the limited opening of CeramFab's facility in East Palestine – prior to February 3, 2023 – CeramSource was already generating 25% more revenue than it had previously been able to achieve. The loss of these synergistic qualities will hamper CeramSource's revenue expansion, likely resetting it to a pre-expansion revenue level of $5,250,000/yr—if not even lower— and eliminating some of the operational efficiencies which were driving down costs.

135.    Since the Derailment, CeramSource has been unable to operate out of the East Palestine location, had time-sensitive inventory go unsold, had to cancel time sensitive orders, and lost existing customers to competitors. In an attempted effort to mitigate losses and keep the 24-year-old company from completely collapsing, CeramSource has now been forced to sign a 10-year lease to move its operations to a new warehouse facility in Pennsylvania.

136.    The new CeramSource lease carries an approximately $26,000/mo rent obligation. All CeramSource operations are presently being moved to this new facility. At this time, only an

extremely limited number of product orders can be fulfilled for CeramSource's customers, and many of CeramSource's customers are now having to source their refractory products elsewhere and are expected to be permanently lost – or at least lost for a prolonged period – customers of Plaintiff.

137. This lost income, lost property value, lost investment in the relocated facility, lost customers, and lost business opportunity is directly and proximately due to the Derailment and Defendants' conduct and is permanent and continuing in nature. The reality is that due to the Derailment, CeramSource will likely never be able to fully recover to pre-Derailment levels absent substantial and immediate capital infusions. As such, CeramSource will have over $9,000,000 in present business interruption losses resulting from the Derailment. If CeramFab and WYG is forced to be permanently closed because of Norfolk Southern's Derailment, the total damages would rise to  approximately $30,000,000.

138. Despite all of the ongoing uncertainty surrounding the Derailment, Mr. Wang is trying to save all of the Plaintiff businesses – either in East Palestine, Ohio or elsewhere – but the business interruptions caused by the Derailment will have at minimum a five-year effect. Based on the toxic chemicals that were found in close proximity to Plaintiffs properties, including in the surrounding soil and interior structures – along with the nature of the buildings, themselves – the only way to effectively restore these properties to pre-loss condition would be to demolish them, including the concrete foundations, and rebuild them from the ground up. The full remediation and present-day replacement cost for the CeramFab structures is $7,584,973.01. For the WYG structures, the full remediation and present-day replacement cost is $18,924,211.28. [4]

139. A great deal of time and capital investments was poured into the two East Palestine properties to establish the multi-tier operation that the CeramSource-CeramFab-WYG synergy of

---

[4] These totals do not account for the underlying value of the land, itself – however diminished it might currently be because of the derailment and post-derailment issues.

companies would become. There were significant material improvements made to what existed prior to the purchase of the properties and the present-day replacement value estimates reflect these changes.

140.    While substantial, this cost still fails to encompass the additional damages related to ongoing business interruption losses, the lost future revenue opportunities, the loss in customers, and the delays for full operational capacity implementation should these plants be successfully remediated and reopened. At best, it will be at least late 2026 or 2027 before all the outlined remediation and replacement work could be completed and that hinges on Norfolk Southern completing its own EPA mandated clean-up efforts before the end of 2023 and there being available contractors to do the work on an accelerated timeframe.

141.    CeramFab first began having sales during the Covid impacted 2020 and 2021 years and while the facility was still undergoing its refit. 2020 Sales were $141,157 and increased to $314,903 in 2021. By the end of 2022, CeramFab had completed all major facility improvements and installation of the second production line – which would begin production in January 2023. This resulted in a 400% sales increase to $1,340,612. Heading into 2023, the plan was to continue building out the production lines and steadily increase the customer base. The first month of 2023 sales were $197,609.05.

142.    Had the Derailment not occurred, CeramFab would have continued progressing along its already established path and buildout trajectory, and the company would have easily reached its $4,000,000 annual 2023 revenue projections. Likewise, the 2024 projection of $12,000,000 is in alignment with the reasonably expected output from the increased production capacity as the final planned production lines were completed. By 2025 and 2026, with the planned buildout capital investments fully behind it and consistent reputational growth, CeramFab was on track to hit its long-term conservatively valued revenue potential of $18,000,000/annually. As such,

CeramFab now has approximately $41,000,000 in present business interruption losses resulting from the Derailment. If CeramFab is forced to be permanently closed because of Norfolk Southern's Derailment, the total damages would rise to more than $130,000,000.

143.    Similar to CeramFab, at the time of the Derailment and release of Toxic Chemicals, WYG was just beginning to scale up its operations.  WYG was conservatively projected to achieve substantial revenue in 2023 and the coming years. Instead of continuing to scale up its operations, however, WYG has now suffered a complete cessation of its production and sales due to the Derailment, the chemical releases, resulting contamination, physical symptoms of employees when exposed, and the contamination mitigation or clean-up efforts undertaken by Defendants or its contractors. WYG's customers canceled orders because of the Derailment, and this lost business opportunity and income is expected to be permanent or at least prolonged in nature.

144.    The present facilities were operating two presses and a single oven, but expansion plans included one more of each along with additional transportation tracks. Plans were for the plant to be at 100% operational capacity with multiple shifts no later than 2025. Once at full capacity, WYG was expected to generate approximately $20,000,000 in annual revenue and over $5,000,000 in annual net profits. As such, WYG now has approximately $100,000,000 in present business interruption losses resulting from the Derailment. If WYG is forced to be permanently closed because of Norfolk Southern's Derailment, the total damages would rise to more than $325,000,000.

145.    Plaintiff Yonggong is a holding company for CeramFab, CeramSource, and WYG. It is also the owner of record for buildings occupied by CeramFab, CeramSource, and WYG. Yonggong's economic loss is the ongoing rental income from the two properties, which totals $984,000 per year. As such, Yonggong now has over $6,000,000 in present business interruption losses resulting from the Derailment. Given that CeramSource is having to lease space from a

different company and that WYG and CeramFab may now be permanently closed, Yonggong will likely suffer this loss each year indefinitely, resulting in total damages in excess of $20,000,000.

146.    As a direct and proximate result of the Derailment, Plaintiffs have lost nearly the entirety of its ongoing revenue, has suffered a loss of past and/or future customer confidence in its ability to operate or fulfill orders, and will likely never again be able to operate its business in its current location or regain its prior growth trajectory. This lost income, lost property value, lost investment, and lost business opportunity and income is directly and proximately due to Defendants' conduct and is permanent and continuing in nature.

147.    In sum, Plaintiffs' present business interruption damages directly and proximately attributable to the Derailment and Controlled Burn caused by Defendants totals over $150,000,000. If Plaintiffs are forced to permanently close CeramFab and WYG because of Norfolk Southern's Derailment, the total true present and future damages would be more than $500,000,000.

## COUNT I: NEGLIGENCE

148.    Plaintiffs restate, reallege, and incorporate by reference the preceding paragraphs as if fully set forth herein.

149.    Defendants had a duty of care to operate, maintain, inspect, and repair their railway and Train 32N in a reasonable manner which would not cause Plaintiffs harm while still complying with all federal statutory requirements. Defendants failed this duty.

150.    Defendants had a duty of care to operate, maintain, inspect, and repair their railway and Train 32N in a manner which was consistent with their own internal safety guidelines while still complying with all federal statutory requirements. Defendants failed this duty.

151.    Defendants had a duty of care to operate, maintain, inspect, and repair their railway and Train 32N in a manner which was consistent with their own externally stated safety practices while still complying with all federal statutory requirements. Defendants failed this duty.

152. Defendants knew or should have known of the dangers of the failure to operate, maintain, inspect, and repair their railway and Train 32N in a reasonable manner and that failure could reasonably lead to a breach of this duty resulting in the damages incurred by the Plaintiffs.

153. Defendants are under a heightened duty to operate, maintain, inspect, and repair their railcars known to be used for transporting toxic and hazardous chemicals. Defendants failed this duty.

154. Defendants had control over this equipment and property at all times herein.

155. Defendants breached their duty of care to Plaintiffs by their failure to:

a) Operate, maintain, inspect, and/or repair the railway and railcars in such a way as to ensure their safe and proper operation during the ordinary course of business, particularly while transporting toxic and hazardous materials;

b) Ensure proper procedures, alarms, and/or other systems for timely monitoring malfunctions of the railway and railcars to prevent or mitigate derailments, particularly while transporting toxic and hazardous materials.

c) Ensure proper safety procedures in the event of a mechanical malfunction of the railway or railcars, particularly while transporting toxic and hazardous materials.

d) Ensure a proper mechanism for stopping or mitigating malfunctioning railcars in a timely manner without derailment, particularly while transporting toxic and hazardous materials.

e) Avoid and/or prevent overloading the train with excessive railcars or materials;

f) Load the railcars consistent with the accepted practice;

g) Load the railcars to avoid placements of the heavier cars in the rear, or "backloading", with particular consideration to whether the planned route is downhill;

h) Ensure to have an adequate number of staff for purposes of planning, coordinating, overseeing, and monitoring the transportation of toxic and hazardous materials by railcar;

i) Hire, train, manage, and supervise their agents, servants, employees, including but not limited to, the train engineer and dispatcher concerning the operation of Train 32N at the time of the Derailment;

j)      Properly and adequately determine the qualifications, skill, and capabilities of their agents, servants, employees, including but not limited to, the train engineer and dispatcher concerning the operation of Train 32N at the time of the Derailment;

k)      Ensure that their agents, servants, employees, including but not limited to, the train engineer and dispatcher, were properly and adequately instructed and trained, particularly while transporting toxic and hazardous materials;

l)      Properly instruct and adequately train their agents, servants, employees, including but not limited to the train engineer and dispatcher concerning the safety and emergency procedures in the event of a possible derailment;

m)      Route railcars transporting toxic and hazardous materials in such a way as to avoid populated areas in order to minimize the risk of accidental exposure;

n)      Adequately warn those in danger of exposure to toxic and hazardous materials;

o)      Institute proper procedures and training for response to the mechanical malfunction of a railcar;

p)      Institute proper procedures and alarms to identify and address fire on a railcar that contains toxic and hazardous materials;

q)      Institute proper procedures and training for response to a derailment of railcars, particularly while transporting toxic and hazardous materials;

r)      Institute proper procedures to avoid exposing toxic and hazardous materials to the environment;

s)      Implement or have an emergency response plan to contain the spread of toxic and hazardous materials into the surrounding air, water, property, and persons in the event of a derailment;

t)      Institute proper procedures for timely notifying the appropriate governmental authorities in the event of a derailment;

u)      Timely implement an emergency-response plan in the event of a derailment;

v)      Transport and handle toxic and hazardous materials so as to not cause harm to Plaintiffs, as Plaintiffs were foreseeable victims located within the Danger Zone of Defendants conduct;

w)      Properly dispose of or otherwise eliminate the toxic and hazardous materials from the derailment site, including but not limited to the use of techniques that further exposed Plaintiffs to these said toxic and hazardous chemicals;

x)  Evacuate an appropriate geographical radius to avoid exposing individuals to toxic and hazardous materials and causing further injuries and/or damages;

y)  Accurately make known the risk of catastrophic injury and illness from exposure to these toxic and hazardous materials to individuals at risk of exposure, including those outside the evacuation zone;

z)  Reasonably pack, transport, maintain, dispose of, or otherwise handle these toxic and hazardous materials; and

aa)  Otherwise unreasonably causing injury to Plaintiffs in ways further investigation and discovery will reveal.

156.  Defendants owed and breached a duty of reasonable care commensurate with the risk of transporting toxic and hazardous materials by railcar.

157.  Defendants owed and breached a duty of reasonable care commensurate with the release and burning of toxic and hazardous materials.

158.  Defendants owed and breached a duty of reasonable care to adequately address the spilled toxic and hazardous materials after the Derailment had taken place.

159.  Defendants prioritized the immediate resumption of its train operations over, and to the detriment of, taking the immediate and necessary steps to address the environmental catastrophe it unleased on Plaintiffs.

160.  The damages sustained by Plaintiffs were caused by and/or aggravated by the fact that Defendants failed to take necessary actions to mitigate the dangers associated with its operations.

161.  As a direct and proximate result of Defendants' discharge, disposal, distribution, and release of toxic and hazardous materials throughout the area in which the Plaintiffs' businesses operate and own property, Plaintiffs presently suffer, and will continue to suffer, property damage, out of pocket expenses, loss of the quiet use and enjoyment of property, diminution of property

value, loss of business income, loss of business goodwill, and inconvenience and emotional distress.

162.    Defendants' conduct as alleged herein shows that it acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant imposing punitive damages.

## COUNT II: STRICT LIABILITY

163.    Plaintiffs restate, reallege, and incorporate by reference the preceding paragraphs as if fully set forth herein.

164.    Defendants are strictly liable for the injuries and damages suffered by Plaintiffs pursuant to the provisions of the Restatement (Second) of Torts §§ 519 and 520.

165.    At all times relevant to this action, Defendants were the owner and operator of Train 32N.

166.    At all times relevant to this action, Defendants had supervision, custody, and control of Train 32N.

167.    At all times relevant to this action, Defendants owed and breached a duty of reasonable care to adequately address the spilled toxic and hazardous materials after the Derailment had taken place.

168.    At all times relevant to this action, Defendants were under a continuing duty to protect the Plaintiffs from the toxic and hazardous materials.

169.    The transportation of these toxic and hazardous materials, including but not limited to vinyl chloride, is an abnormally dangerous and/or ultrahazardous activity under the definition set forth in Restatement (Second) of Torts §§ 519 and 520.

170.    Defendants engaged in an abnormally dangerous and/or ultra-hazardous activity for which common law strict liability applied for transporting hazardous substances which Defendants knew to be dangerous and failing to take proper precautions.

171.    Had Defendants not engaged in the abnormally dangerous and/or ultra-hazardous activity, Plaintiffs would not have had their property contaminated or exposed to dangerous level of these toxic and hazardous materials, and they would not endured the other damages set forth herein.

172.    The harm to Plaintiffs was and is the kind of harm that would be reasonably anticipated as a result of the risks created by transporting toxic and hazardous materials in close proximity to residential, commercial, and agricultural areas.

173.    Defendants' operations and toxic discharges were, and will, remain a substantial factor in causing harm to Plaintiffs.

174.    As a direct and proximate result of Defendants' acts or omissions in the course of conducting this abnormally dangerous and/or ultra-hazardous activity, Plaintiffs presently suffer, and will continue to suffer, property damage, out of pocket expenses, loss of the quiet use and enjoyment of property, diminution of property value, loss of business income, loss of business goodwill, and inconvenience and emotional distress.

175.    Defendants are strictly liable, jointly and severally, without regard to fault, for all damages to Plaintiffs, which were a direct and proximate result of the Derailment and release of toxic and hazardous materials that harmed Plaintiffs as described herein.

176.     Defendants' conduct as alleged herein shows that it acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant imposing punitive damages.

## COUNT III: PRIVATE NUISANCE

177.    Plaintiffs restate, reallege, and incorporate by reference the preceding paragraphs as if fully set forth herein.

178.    Defendants have created a condition that is harmful to the health of anyone utilizing Plaintiffs' property and thus interferes with the use and enjoyment of that property, caused displacement and business interruption, and caused Plaintiffs to suffer the injuries and inconvenience described herein.

179.    Plaintiffs have suffered, and will continue to suffer from, injuries that are different from those experienced by the public generally, including the contamination of their property and interference with their businesses and the use and enjoyment of their properties.

180.    The seriousness of the harm associated with Defendants' discharge of toxic and hazardous materials outweighs the public benefit of Defendants' conduct.

181.    Defendants knew or should have known that the toxic and hazardous materials it was transporting were harmful to individuals and real property, and that it was substantially certain that improper transportation, handling, and disposal of such materials would cause injury to Plaintiffs and their property.

182.    Defendants knew or should have known that their post Derailment mitigation efforts would inadequately address the spilled toxic and hazardous materials and serve to exacerbate the damages to Plaintiffs and the wider community.

183.    Defendants' contamination of Plaintiffs' property with toxic and hazardous substances has unreasonably and substantially interfered with their rights to use and enjoy their property.

184.    Defendants' contamination of Plaintiffs' property with toxic and hazardous substances has caused and will continue causing them to, among other things, refrain from

occupying or using their real properties, being able to sell finished products that were contaminated, and allowing employees to safely occupy and use their facilities. This has, in turn, caused significant loss of income, out of pocket expenses, diminution in property value, and inconvenience.

185.    Defendants' negligent, reckless and/or intentional acts and omissions were unreasonable and constitute invasion of the property rights of Plaintiffs.

186.    Plaintiffs, unlike the public generally, have suffered specific injuries as a result of Defendants' tortious conduct including the contamination of their property and interruption of virtually all of their ongoing business activity.

187.    Defendants' improper transportation and handling of toxic and hazardous materials, both before and after the Derailment itself, and the contamination of Plaintiffs' property resulting therefrom, constitutes a private nuisance.

188.    Defendants' improper transportation and handling of toxic and hazardous materials has directly and proximately caused Plaintiffs to presently suffer, and continue to suffer in the future, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, and inconvenience.

189.    Defendants' conduct as alleged herein shows that Defendants acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

## COUNT IV: PUBLIC NUISANCE

190.    Plaintiffs restate, reallege, and incorporate by reference the preceding paragraphs as if fully set forth herein.

191.    Defendants' improper transportation and handling of toxic and hazardous materials has created conditions that are harmful to the health of anyone utilizing Plaintiffs' property and thus interferes with the use and enjoyment of that property, caused displacement and business interruption, and caused Plaintiffs to suffer the injuries and inconvenience described herein.

192.    As a result of Defendants' actions and/or inactions, Plaintiffs have suffered a permanent loss of use and enjoyment of their property.

193.    Defendants knew or should have known that the toxic and hazardous materials being transported were hazardous and harmful to real property and individuals, and it was substantially certain that improper transportation and handling of these materials were hazardous and harmful to property and people living in surrounding communities.

194.    Defendants knew or should have known that their post Derailment mitigation efforts would inadequately address the spilled toxic and hazardous materials and serve to exacerbate the damages to Plaintiffs and the wider community.

195.    Plaintiffs have a common right to enjoy their real property free from dangerous contamination, to have clean air in and around their businesses, have access to clean running water without dangerous levels of toxic chemicals, and to operate their businesses without unreasonable exposure to toxic chemicals.

196.    Defendants' improper transportation and handling of toxic and hazardous materials substantially and unreasonably infringed upon these public rights.

197.    As a direct and/or proximate result of Defendants' improper transportation and handling of toxic and hazardous chemicals, Plaintiffs' and the general public's common right to breathe clean air and have access to clean water without dangerous levels of toxic chemicals was severely diminished, if not entirely eliminated.

198.    As a direct and/or proximate result of Defendants' mishandling of toxic and hazardous materials, both before and after the Derailment itself, Defendants invaded and contaminated the areas surrounding Plaintiffs' businesses, thus exposing all employees and other users of Plaintiffs' property to toxic chemicals and carcinogens.

199.    Defendants' release of these toxic and hazardous materials also affects and will continue to affect the public at large, causing massive environmental damage to the surrounding area.

200.    Defendants' conduct is a substantial factor in creating a public nuisance and the public's exposure to toxic chemicals resulting therefrom, Plaintiff presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, and inconvenience.

201.    Defendants' conduct as alleged herein shows that Defendants acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

## COUNT V: TRESPASS

202.    Plaintiffs restate, reallege, and incorporate by reference the preceding paragraphs as if fully set forth herein.

203.    Defendants, though its tortious conduct alleged herein, caused and/or allowed dangerous chemicals to enter and contaminate Plaintiffs' properties.

204.    Defendants knew or should have that the chemicals being transported were hazardous and harmful to real property, animals, and individuals, and it was substantially certain that their use, emission, discharge, disposal, distribution, spreading and/or release of these toxic and hazardous materials would cause injury to Plaintiffs and their properties.

205.     Defendants knew or should have known that their post Derailment mitigation efforts would inadequately address the spilled toxic and hazardous materials and serve to exacerbate the damages to Plaintiffs and the wider community.

206.     Defendants intentionally, knowingly, and/or negligently discharged and released highly toxic chemicals onto the properties of Plaintiffs.

207.     Defendants, through their activities alleged herein, authorized, requested, or caused others to dispose of waste in a manner which they knew was substantially likely to cause hazardous materials to enter and contaminate Plaintiffs' properties. Through its actions in intentionally causing others to spread their waste, they intentionally, knowingly, and/or negligently caused hazardous materials to enter Plaintiffs' land and water.

208.     Defendants intentionally, knowingly, negligently, carelessly, and/or recklessly caused a trespass in the following manners:

a)       by discharging through the Derailment and resulting fires pollutants, particulates, oily residue, and chemicals to release into the air, water, and soils; and

b)       by allowing or causing such chemicals to discharge, seep, or migrate underground in such a manner that it was reasonably foreseeable that the toxic material would, in due course, invade Plaintiffs' real property and cause physical injury to that property.

209.     At all times, Defendants' conduct displayed indifference to and disregard for Plaintiffs' right to enjoy the safe use of their safe property and environment.

210.     Defendants' conduct invaded the real property of Plaintiffs and interfered with their possessory interests of that property.

211.     The discharge of toxic and hazardous materials onto the real property of Plaintiffs caused physical damage to their property by casting over their property a plume of offensive emissions, pollutants, depositing chemical residue on their businesses, causing damage to their

buildings and landscaping, and invading their real property with a nauseating smell over a continuous and sustained period of time.

212. The discharge of toxic and hazardous materials caused Defendants to enter, invade, and intrude on the real properties of Plaintiffs without their privilege, permission, consent, authorization, invitation, or justification.

213. Defendants' intentional, knowing, and negligent contamination, and continuing contamination, of Plaintiffs' real and personal property with toxic and hazardous materials has interfered with their rights to use and enjoy their property and constitutes trespass and continuing trespass. Defendants' trespass has substantially impaired Plaintiffs' rights in the use and enjoyment of their property as well as economic and property damages as alleged herein.

214. Defendants' trespass has also interfered with, and continues to interfere with, Plaintiffs' ability to use and enjoy their property, to avail themselves of their property's value as an asset and/or source of collateral for financing, and to use their property to operate their businesses or in any other manner that Plaintiffs so choose.

215. As a direct and/or proximate result of Defendants' intentional, knowing, and negligent discharge of highly toxic and hazardous chemicals into Plaintiffs' properties, Plaintiffs are entitled to damages, in an amount to be proven at trial, including, but not limited to, property damage, diminution of value of real estate, the cost to repair the damage and restore the property to its pre-trespass condition, the costs of recovering possession of the property, business losses, and the value of their lost use of the property as a result of all trespass and for Defendants' ongoing trespass.

216. Defendants' conduct as alleged herein shows that Defendants acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

## COUNT VI: WILLFUL AND WANTON CONDUCT

217.     Plaintiffs restate, reallege, and incorporate by reference the preceding paragraphs as if fully set forth herein.

218.     Defendants owed Plaintiffs a duty to refrain from willful, wanton, reckless and outrageous conduct and/or conduct which exhibited an utter indifference and/or conscious disregard to the health, safety, and well-being of Plaintiffs.

219.     Upon information and belief, Defendants were aware that they were transporting materials that were highly toxic, carcinogenic, mutagenic, and/or otherwise harmful to human beings, animals, and the environment.

220.     Upon information and belief, Defendants were aware that transporting, releasing, and igniting substances that were highly toxic, carcinogenic, mutagenic, and/or otherwise harmful to individuals, animals, and the environment could result in unreasonably dangerous emission of toxic and hazardous materials into the surrounding communities.

221.     Defendants knew or should have known that at least one railcar was malfunctioning and/or on fire for at least 20 miles before the Derailment.

222.     Upon information and belief, Defendants violated 49 CFR § 215.115(a) for at least 20 miles by allowing a defective wheel bearing to remain in service before the Derailment.

223.     Defendants knew or should have known that their post Derailment mitigation efforts would inadequately address the spilled toxic and hazardous materials and serve to unreasonably exacerbate the damages to Plaintiffs and the wider community.

224.     Despite this knowledge, and contrary to federal and standard industry practices and procedures, Defendants breached their duties as described in Count I above.

225.     Defendants' failures to exercise any care toward Plaintiffs as described in Count I above and other respects constitute willful, wanton, reckless and outrageous conduct, and

demonstrates an utter indifference and/or conscious disregard for the Plaintiffs' businesses and properties and to the health, safety, and well-being of anyone using Plaintiffs' property.

226.    The failures to exercise any care toward Plaintiffs occurred under circumstances for which the probability of harm was great and the probability of harm was known to Defendants.

227.    Through their unreasonable and dangerous actions and omissions described above, Defendants intentionally deviated from a clear duty or definite rule of conduct, acted with a deliberate purpose not to discharge a duty necessary to safety, or purposely performed wrongful acts with knowledge and appreciation of the likelihood of resulting injury.

228.    As a direct and/or proximate result of Defendants' willful, wanton, reckless and outrageous transportation, emission, discharge, and release of toxic and hazardous materials near Plaintiffs' properties, Plaintiffs presently suffer, and will continue suffering in the future, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, and inconvenience.

229.    Defendants' conduct as alleged herein shows that Defendants acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.


Dated: November 14, 2023                    Respectfully submitted,

                                            */s/ Jon C. Conlin*
                                            Jon C. Conlin (AL Bar# ASB-7024-J66C)
                                            F. Jerome Tapley (AL Bar# 0583-A56T)
                                            R. Andrew Jones (AL Bar# 0096-I11R)
                                            Hunter M. Phares (AL Bar# 5406-G38V)
                                            **CORY WATSON, P.C.**
                                            2131 Magnolia Ave South
                                            Birmingham, AL 35205
                                            Phone: (205) 328-2200
                                            Fax: (205) 324-7896

jconlin@corywatson.com
jtapley@corywatson.com
ajones@corywatson.com
hphares@corywatson.com

*Attorneys for Plaintiffs*