**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CERAMFAB, INC. et al.,<br><br>Plaintiffs,<br><br>v.<br><br>NORFOLK SOUTHERN CORPORATION et al.,<br><br>Defendants. | ) | Case No. 4:23-cv-02206-BYP<br><br>JUDGE BENITA Y. PEARSON |

**PLAINTIFFS' MOTION TO EXCLUDE THE OPINIONS OF BRENT FINLEY**

Pursuant to the Court's Case Management Order [ECF No. 36], Plaintiffs move to exclude or limit the testimony and opinions at trial of Dr. Brent Finley ("Dr. Finley"), whom Defendants Norfolk Southern Corp, et al. (collectively, "Defendants" or "Norfolk Southern" or "NS"), retained as their expert and who issued a report and provided sworn deposition testimony.

As set forth in the memorandum, Dr. Finley's opinions do not meet the standards as set by Rule 702. The Court should therefore order this expert's testimony and opinions to be limited or excluded.

*/s/ Jon C. Conlin*
Jon C. Conlin (AL Bar No. 7024-J66C)
R. Andrew Jones (AL Bar No. 0096-I11R)
Hunter M. Phares (AL Bar No. 5406-G38V)
James E. Cory (Admitted *Pro Hac Vice*)

CORY WATSON, P.C.
2131 Magnolia Avenue S.
Birmingham, AL 35205
Phone: (205) 328-2200
Fax: (205) 324-7896
jconlin@corywatson.com
ajones@corywatson.com
hphares@corywatson.com
jcory@corywatson.com

*Counsel for Plaintiffs*

**PLAINTIFFS' MEMORADUM IN SUPPORT OF MOTION TO EXCLUDE THE OPINIONS OF BRENT FINLEY**

## I. Introduction and Background

Dr. Finley was employed by NS to provide a report (Exhibit A: May 15, 2026, Expert Report of Brent Finley) and testimony (Exhibit B: August 6, 2026, deposition of Brent Finley) rebutting the opinions of several of Plaintiffs' experts.[1] *See* Exhibit A (Finley report) at 98-115. Dr. Finley also opined on the quality of NS's air sampling around Plaintiffs' properties, the accuracy of Arcadis' sampling methods and delineation determinations, that Plaintiffs' employee-reported health effects are not related to the contamination, and that other vinyl chloride monomer ("VCM") releases do not support the health effect-related issues identified in this case. *Id.* at 9.

For the scope of his opinions, Dr. Finley relied on select case materials and deposition transcripts provided by defense counsel, and his own professional qualifications and experiences. *See Id.* at 7-8; Exhibit B (Finley Deposition) at 10:4-11:9; 19:23-21:21; 22:13-23:17. Notably, Dr. Finley has also never spoken with any individual about any of the facts or circumstances

[1]Those Plaintiff experts are: Dr. David Pritchard (regarding the reasonableness of Mr. Wang's concern and decisions based on the content of information and/or media which was presented after this derailment) (See Exhibit C: April 6, 2026, Expert Report of Dr. David Pritchard); Dr. Michael Larranga (regarding the combustion byproducts from the vent and burn and the symptomology related to the same) (See Exhibit D: April 6, 2026, Expert Report of Dr. Michael Larranga); Mr. Stephen Petty (regarding the contamination on and around Plaintiffs' properties, the source of that contamination, problems with NS's claimed background levels vs actual background dioxin levels, the fate and transport of the chemicals released during the Derailment, the incomplete combustion plume deposition from the Vent and Burn, NS's sampling, EPA oversight concerns, and limitations/inaccuracies contained in Arcadis' delineation report) (See Exhibit E: April 6, 2026, Expert Report of Mr. Stephen Petty); and Dr. Paul Rosenfeld (regarding the air and plume modeling from the Vent and Burn, how incomplete combustion events like in this case manifest and what contaminants (i.e., dioxins) form within them, how and where the plume deposited the contaminants (i.e., dioxins), problems with NS's claimed background levels vs the actual background dioxin levels, the contaminants on and around Plaintiffs' properties, and the source of those contaminants) (See Exhibit F: April 6, 2026, Expert Report of Dr. Paul Rosenfeld).

surrounding the Derailment; Plaintiffs and their properties, businesses, and employees; the sampling sources and instruments employed by Plaintiffs' experts; or the specific events on which he seeks to opine and he is, therefore, limited under Rule 702 to his listed reliance materials to form the basis of his opinions. *See* Exhibit B (Finley Deposition) at 88:15-89:18; 119:20-123:8. This is a problem for many of the opinions Dr. Finley asserts rebutting Plaintiffs' experts as well as the affirmative opinions noted above and discussed in his report. *See* Exhibit A (Finley Rpt.) at 15-97. For example, when deposed, Dr. Finley made numerous concessions and acknowledged certain facts that undermine the foundation of his opinions:

**Concerning what type of burn event the Vent and Burn was, what contaminants were included in it, or what waste contaminants were released at the tracks—**

1. While he agrees the Derailment and Vent and Burn released contaminants directly into the air and soil, he does not know whether the burn was an incomplete combustion event and cannot state what chemicals would be released in an incomplete combustion event as occurred here. Exhibit B (Finley Dep.), at 24:1-25:18; 26:2-27:8; 27:9-27:21; 31:6-31:12;[2]
2. He never looked to determine the waste contaminant levels at the tracks under and around where the Derailment occurred. *Id.* at 151:4-151:12;
3. He does not know what the benzene levels were at the Derailment site and if there were exceedances and cannot opine on the topic either way. *Id.* at 150:16-151:12;
4. He agrees benzene was in two of derailed cars, and that they were moved onto the CeramFab property into the "scrapping" area, but he cannot state how much benzene was in the cars. *Id.* at 36:23-37:19; 110:6-119:19; 112:22-115:21;

**Concerning what chemicals he agrees were released (despite the limitations of his knowledge about incomplete combustion events and what waste contaminants existed) following the Derailment and Vent and Burn, and what was done to determine if the chemicals found in East Palestine (or at Plaintiffs' properties) were from the Derailment-related events—**

5. Volatile Organic Compounds ("VOCs") were released. *Id.* at 27:24-28:18;
6. The contaminants released can cause adverse health effects. *Id.* at 28:19-29:3;
7. The contaminants can have both acute and chronic health effects. *Id.* at 29:4-29:15;
8. The contaminants released are carcinogenic in humans. *Id.* at 29:4-29:15;
9. He cannot state to a reasonable degree of certainty that dioxins were not released during the Derailment or Vent and Burn events. *Id.* 30:21-31:12;

---

[2] This concession eliminates his ability to rebut Dr. Larranaga's opinions about the contaminants released during an incomplete combustion event like occurred in this case and what the acute symptomology would be for the same—symptomology experienced by Plaintiffs' employees. *See* Exhibit A (Finley Rpt.), at 100-101.

10. Dioxins are a known human carcinogen, and this was well known prior to the Derailment. *Id.* at 33:23-35:9;
11. There were never any attempts by NS or its contractors to do chemical forensic analysis, or "fingerprinting," to determine if the dioxins found in East Palestine (or at Plaintiffs' properties) were from the Derailment despite this methodology being available at the time. *Id.* at 50:6-52:3:
12. VCM was released and is a known human carcinogen, and this was well known prior to the Derailment. *Id.* at 35:10-36:22; 37:23-38:11;
13. There were never any attempts by NS or its contractors to do chemical forensic analysis, or "fingerprinting," to determine if the VCM found in East Palestine (or at Plaintiffs' properties) was from the Derailment. *Id.* at 52:13-52:22;

**Concerning what would have been known about the risk of dioxin release prior to the Vent and Burn and whether anything was done to address, examine, or mitigate the risk before the burn was conducted; and what was done to monitor what dioxins were released after the Vent and Burn and to determine if the dioxins found in East Palestine (or at Plaintiffs' properties) were from the Derailment-related events—**

14. NS or its contractors should have known that dioxins could be released from the Vent and Burn before it was conducted. *Id.* at 31:13-31:22;
15. He saw no evidence that anything was done to determine what level of dioxins would be released or where the plume/dioxins would go prior to the Vent and Burn being conducted. *Id.* at 31:23-33:22;
16. No dioxin air sampling was conducted for a month after the Derailment. *Id.* at 50:6-50:10;
17. There were never any attempts by NS or its contractors to do chemical forensic analysis, or "fingerprinting," to determine if the dioxins found in East Palestine were from the Derailment despite this methodology being available at the time. *Id.* at 50:6-52:3;
18. He can identify no specific source of dioxins on any properties and did not even try to do so other than to say it was "background." *Id.* at 155:11-158:6.[3, 4]

**Concerning background sampling and his knowledge of where the plume went or where the plume deposited the contaminants it carried—**

19. If background samples were taken under the Vent and Burn plume, then that could invalidate the propriety of their use for background comparison. *Id*. at 123:9-124:7;
20. The Vent and Burn plume carried contaminants, and it spread at least through the night of February 6-7, 2023. *Id.* at 41:19-42:6; 44:10-44:20.
21. He agrees the plume was carrying soot/ash, but he does not know where that soot/ash went or was deposited and made no attempts to determine such matters. *Id.* at 46:14-47:12;
22. NS used 25 samples to establish the Background Threshold Level ("BTL") after the Derailment, all of which were collected from sites north and west of the event, but he

---

[3] "[I]f there's a specific site-related source, I don't know what it is, it's not something I looked at." Exhibit B (Finley Depostion), at 156:24-157:3.

[4] "[Q.] [Y]ou cannot state to a reason [sic] degree of certainty with any specificity what single source or multiple sources could be the cause of that, the specific sample reading for dioxins on the WYG property, correct? A. Yeah, that's not something I would try to do. Q. You didn't even try to do that, correct? . . . A. That's not something I would ever try to do." *Id.* at 157:16-158:6.

cannot state to a reasonable degree of certainty that the plume contaminants did not contaminate those sampling sites used to set the BTL. *Id.* at 175:7-175:22;

23. He agrees plume soot/ash was reported on the CeramFab property and believes plume soot/ash was also reported on the WYG property, but he cannot state to reasonable degree of certainty whether or not plume soot/ash was on the WYG property or within 25 meters of either property. *Id.* at 86:18-88:14;

**Concerning how the Derailment-related contaminants migrated/moved through the environment (i.e., "fate and transport") or how they may have reached plaintiffs' properties—**

24. While Sulfur Creek runs next to the Derailment site and then under and adjacent to Plaintiffs' WYG property, he did nothing to analyze Sulfur Creek, determine exactly where it flows, how it relates to WYG, or what contaminants were in it, and also cannot offer any opinions on the same. *Id.* at 40:7-41:16;
25. There are definitely contaminant exceedances at the tracks, but he is not a fate and transport expert and cannot opine how the chemicals move through the environment or through the soil from the tracks to Plaintiffs' properties. *Id.* at 144:19-146:21; 148:4-148:19;
26. Despite not being an expert on fate and transport or the local geography, it is well understood that benzene can migrate through soil. *Id.* at 152:7-152:10;

**Concerning the accuracy of Plaintiffs' sampling data, the validity of the results, or any problems with the sampling methodology—**

27. He cannot offer any opinion that the results from any of Plaintiffs' (i.e., Mr. Petty's) four (4) sampling data sets are faulty or inaccurate. *Id.* at 131:23-133:25;

**Concerning Mr. Petty's opinions on the source of the perfluorooctanoic acid ("PFOA") found on Plaintiffs' CeramFab property and how the combustion event caused the aqueous film-forming foam ("AFFF") to breakdown into the chemical components found on Plaintiffs' property—**

28. He did not "chase down" Mr. Petty's opinion and analysis on PFOA releases from the use of AFFF to extinguish fires in a combustion event, as was the case here, and he cannot offer an opinion to a reasonable degree of certainty what the chemical breakdown would be for the AFFF. *Id.* at 56:14-57:23;

**Concerning the contaminants found on Plaintiffs' Properties or what was contaminated and how it was or was not remediated—**

29. There was only a single NS/Arcadis dioxin test on the CeramFab property, and it was a composite taken from multiple soil samples. *Id.* at 78:8-79:13;
30. He cannot identify the specific locations where those samples were collected on the property. *Id.*
31. Homogenizing composite soil samples from multiple locations (as was done at CeramFab) can dilute the results for the highest soil sample. *Id.* at 134:4-137:16; 138:23-140:20;
32. He cannot state to reasonable degree of certainty what any individual sample contaminant (dioxin) levels were for the one Arcadis result listed at CeramFab and cannot say what the highest dioxin reading would be. *Id.*
33. He cannot even state to a reasonable degree of certainty how many samples were combined before the composite was sent to the lab. *Id.*

34. He believes the only two areas where soil was remediated/removed on the property were the two locations where benzene was found. *Id.* at 81:18-82:3;
35. He has done nothing to review, and cannot offer an opinion on, whether any equipment or inventory at Plaintiffs' businesses were contaminated. *Id.*at 88:16-90:20;
36. He agrees no soil sampling was ever performed under the CeramFab or WYG buildings to determine what contamination is present there; *d.* at 80:10-81:2;
37. He agrees Mr. Petty's sampling on March 19, 2026, shows 15.9 parts per trillion ("ppt") of dioxins at CeramFab, which is three times higher than the regional screening level ("RSL") for cancer of 4.8 ppt.[5] *Id.* at 166:9-167:7; 168:25-169:14; 170:3-170:11;
38. He agrees Mr. Petty's March 19, 2026, sampling shows 60 ppt of dioxins at WYG, which is twelve times higher than the RSL for cancer of 4.8 ppt, three times higher than the NS Background Threshold Level ("BTL") of 18 ppt, and three times higher than the commercial screening level ("CSL") used by EPA for commercial properties of 22 ppt, and 1.2 times higher than the non-cancer RSL of 51 ppt.[6] *Id.* at 180:18-182:11; 203:6-203:16;

**Concerning his inability to validate Norfolk Southern's/Arcadis' determination (speculation) of where the contaminants found on CeramFab originated or how they would be from other non-Derailment sources as identified in the delineation report or his own report—**

39. When discussing "coal" being a source for the benzene found on CeramFab property, 100% of samples that showed coal were collected from under the "scrapping area" where the derailed cars were placed after being moved from the tracks. He cannot state there was coal anywhere else on the property, whether the coal was at the scrapping area before the derailed cars were placed on the property, nor if Arcadis did anything to determine whether the coal was present before the cars were placed on the property. He did nothing to analyze or determine if the derailed cars, themselves, were the actual source of the coal readings. *Id.* at 110:6-119:19;
40. The derailed cars placed on the CeramFab property included the two cars which contained benzene. *Id.* at 112:22-115:21;
41. He does not know, and cannot state to any degree of certainty, what work was done on the derailed cars after they were placed on the CeramFab property, what condition they were in while on the property, or what condition they were in when they left the property. *Id.*;
42. When discussing Arcadis' delineation report's claims that safety data sheets ("SDSs") supported their determination that benzene and VCM readings at CeramFab were not from the Derailment, he never saw proof that any SDS was ever actually reviewed by Arcadis or provided to NS, while conceding that Arcadis confirmed that if any SDS had been reviewed it would have been provided to NS. He further did not see any SDS for any product which was located in CeramFab or WYG, and cannot opine on what any SDS would have said for any product located at either property. *Id.* at 94:8-107:18;
43. When discussing Arcadis' claims in the delineation report that cleaning products were a source of contaminant findings at CeramFab, he saw no evidence any sampling was ever done on any cleaning product to determine what might be the levels (or even whether there was any presence) of benzene or VCM in them. *Id.* at 91:12-92:8;

---

[5] *See* Exhibit G (Rebuttal Expert Report of Mr. Stephen Petty, May 29, 2026), at 43.
[6] *Id.*

44. When discussing Arcadis' delineation report claims that any benzene was likely from gas/petroleum product use, he saw no evidence of MTBE in any samples at Plaintiffs' properties or at the derailment site despite MTBE being a component of petroleum/gas/diesel products. *Id.* at 140:21-141:2; 141:15-142:6;
45. He saw no evidence in anything he reviewed which showed that any specific petroleum source was identified as cause of benzene on Plaintiffs' properties and he never made any attempt of his own to determine a specific source. *Id.* at 143:11-144:18;
46. He can identify no specific source of dioxins on either of Plaintiffs' properties and did not even try to do so other than to say it was "background." *Id.* at 155:11-158:6.[7, 8]

**Concerning the lack of rigor he used to review or analyze Plaintiffs' sampling—**

47. He agreed that when reviewing the analytical results of sampling data, "[y]ou must look at all of the data regardless of source"—"you cannot pick and choose"—"if you want[] to have a reasonable understanding of what the contamination is." *Id.* at 249:8-249:18;
48. Despite his agreement that you must look at all data, he chose not to look at Plaintiffs' data for his opinions and will only use the Arcadis data despite whatever limitations or issues might exist. *Id.* at 252:6-256:12; 257:20-263:4.
49. While Mr. Petty spent 90 pages discussing Plaintiffs' sampling data and included hundreds of pages of reports with chains of custody and other sample information included, and had all the analysis run through an independent third party quality assurance and quality control ("QA/QC") process—he admitted he only "looked at it. I didn't analyze it." *Id.* at 263:3-263:4; *see id.* at 252:6-256:12; 257:20-263:4;

**Concerning contamination/data analysis limitations of Arcadis' sampling and monitoring instruments—**

50. There was no dioxin air sampling by NS for at least a month after the Derailment. *Id.* at 50:6-50:10;
51. He cannot state what any of the instrumentation calibration levels (particularly for the air sampling devices, or "PiDs") were, if they were appropriate to identify all the contaminants released, or if they could have found levels below 50 parts per billion ("ppb"), but he agrees that any contaminant existing below the calibration level would be reported as a non-detect even if something—hazardous or not—was present. *Id.* at 194:6-199:6;

**Concerning the lack of a sufficient basis for his EPA oversight opinions or reasonableness of Norfolk Southern's sampling plans and sampling activities—**

52. He never worked at EPA and cannot offer an opinion on EPA's oversight in this case and whether or not it was adequate or reasonable. *Id.* at 127:13-128:10; 129:9-129:21;
53. He cannot state to a reasonable degree of certainty that NS, or its contractors, provided EPA (nor if the EPA reviewed) every work plan, data set, sample, remediation report/document, or even everything Arcadis claimed supported their arguments in the CeramFab delineation report. *Id.* at 200:6-202:4;

---

[7] If there's a specific site-related source, I don't know what it is it's not something I looked at. *See* Exhibit B (Finley Depostion), at 156:24-157:3.

[8]Q. You cannot state to a reason degree of certainty with any specificity what single source or multiple sources could be the cause of that, the specific sample reading for dioxins on the WYG property, correct? A. Yeah, that's not something I would try to do. *Id.*at 157:16-158:6.

54. While he believes any sampling plan deviation should be documented, that is "outside [his] area of expertise." *Id.* at 124:10-126:15;
55. He confirmed that the sampling was all done by NS contractors, and he cannot state to a reasonable degree of certainty how involved EPA was with the sampling or what was observed by them of the sampling that was conducted. *Id.* at 57:24-60:6;
56. He does not know who EPA stated is the responsible party or what it means to be a responsible party in a CERCLA-type event like what occurred in this case, or what responsibilities a responsible party has. *Id.* at 68:21-70:14; 76:15-76:23;

**Concerning the limitations and speculation surrounding his opinions that Plaintiffs' employees' reported post-Derailment ailments and health complaints were not Derailment-related—**

57. He is not an epidemiologist, does not have an epidemiology degree, and never taught an epidemiology class. *Id.* at 90:21-90:23; 92:29-92:14;
58. He agrees the employees first started getting sick and reporting symptoms and began complaining and seeking medical treatment in the first week of their return to work after the evacuation and that this led to Mr. Wang re-closing the businesses. *Id.* at 216:8-217:25;
59. He cannot dispute that any of the employees' reported symptoms did in fact occur nor claim that any of the employees were lying about their symptomology. *Id.* at 219:14-220:6;
60. He cannot claim the 14 employee health records he reviewed (almost 30% of all employees) negates that other employees also experienced symptoms. *Id.* at 220:15-222:2;
61. The employees would know the difference between their pre- and post-Derailment health conditions and would know if they felt symptoms post-Derailment which did not exist before the contamination. *Id.* at 222:2-223:20;
62. In contradiction to his opinion at pages 74-76 of his report,[9] he cannot state to a reasonable degree of certainty whether the employees were exposed to ceramic fibers, and if they were, how much exposure they received prior to the Derailment that could cause the reported symptoms, and he did nothing to try and determine the same. *Id.* at 223:24-224:14;
63. In direct contradiction to his opinion at pages 74-76 of his report, he cannot state to a reasonable degree of certainty that the employee symptoms reported after the contamination were the same prior to Derailment. *Id.*;
64. The discussion of 1970s and 1980s vinyl chloride release events at page 90 of his report (Exhibit A) are not comparable to the present case because they were different type of events ("not apples to apples") and there was no meaningful health assessment performed on them to compare to East Palestine. *Id.* at 225:14-228:2-237:6-327:12; 228:3-230:8;
65. The Paulsboro, NJ event he describes[10] was not similar to East Palestine because there was no burn, no plume, no combustion contaminants released, no dioxins released, and no other contaminants released beyond just VCM, and it was, again, not "apples to apples." *Id.*
66. Even though the Paulson, NJ event was not substantially similar, three separate studies still established the same contamination symptoms were present in that exposed population as was reported by Plaintiffs and their employees in this case. *Id.* at 230:12-236:3;

---

[9] *See* Exhibit A (Finley Rpt.), at 74-76 ("In my opinion, if any worker was complaining of respiratory effects when they returned to work in February 2023, or when the Complaint was filed, or is still currently claiming such symptoms, the effects were more likely to be caused by [refractory ceramic fiber] exposure and not any derailment-related or vent/burn chemicals.")
[10] *See* Exhibit A (Finley Rpt.), at 91-97.

67. He was only able to identify a single international event (in Germany) that involved a VCM combustion (burn) which had any health assessment performed, and it demonstrated the same contamination exposure symptomology was present that exposed population as was reported by Plaintiffs and their employees in this case. *Id.* at 236:4-238:25;
68. The May 15, 2026, Health Survey of East Palestine exposed residents which was published in a peer review journal described the same exposure symptoms were present as was reported by Plaintiffs and their employees in this case. *Id.* at 239:18-241-21;
69. The same May 15, 2026, peer-reviewed study concluded that the long-term health consequences for East Palestine residents and workers remains uncertain. *Id.*;
70. He agrees there has been no study to determine the long-term health effects from the Derailment, and that he would need at least five years of data before knowing that answer and "three [years] is not enough" time to know the long-term effects. *Id.* at 241:17-245:9;
71. While he still wants to opine that he does not believe there is not enough exposure to cause any health risks, he concedes that "if the NIH wants to put this to bed, they probably should take it to five years" and then do their study." *Id.*;

**Concerning the limitations of his expertise and the resulting limitations (or apparent abandonment) of his purported rebuttals of Dr. Pritchard, Dr. Larranaga, and Dr. Rosenfeld—**

72. Despite spending seven pages "rebutting" Rosenfeld's opinions and air modeling—including his use of Personal Weather Station ("PWS") derived data,[11] he did nothing to validate the accuracy of the PWS-derived data, Dr. Rosenfeld's air modeling methodology, his air modeling results, or the accuracy of the data, and he cannot offer an opinion on any of it at trial.[12] *Id.*at 119:20-123:8;
73. He only really looked at the Mr. Petty's rebuttal report (Exhibit G) and did not really look at the rebuttals for Dr. Rosenfeld, Dr. Larranaga, or Dr. Pritchard, and did not bother to review their expert depositions because that was not the focus of his opinions at trial. *Id.* at 19:23-21:21; 22:12-23:17;
74. That "[he] probably shouldn't say that, but [Dr. Rosenfeld's opinions are] not the focus of [his] analysis" and he "may get in trouble for saying that" but he will not offer opinions on them at trial. *Id.* at 121:13-122:13;
75. He is not a psychiatrist, a psychologist, or a human factors expert; and has never taught classes or written papers on those topics or any topic that falls within the expertise of those areas or—by extension—Dr. Pritchard's training. *Id.* at 90:24-91:11; 92:15-94:2.

These voluminous concessions, limitations, and acknowledgements of adverse facts, including limitations flowing from the narrow scope provided by NS counsel and his own lack of

[11] *Id.* at 109-15.

[12] This concession also eliminates his ability to rebut Dr. Rosenfeld's air modeling-based opinions establishing that the NS's background samples were collected within the plume area in which the contaminants were deposited and that the contaminants in that location invalidate the accuracy of NS's background level figure. *See* Exhibit F (Rosenfeld Rpt.), at 34, 46-53, 82, 90-91; Exhibit H (Rebuttal Expert Report of Dr. Paul Rosenfeld, May 29, 2026), at 37-43, 104-107, 117.

experience, demonstrate Dr. Finley's failure to follow a reasonable methodology and his undue reliance on assumptions that are unsupported or, worse, contradicted by the evidence. Dr. Finley's desired testimony ventures well beyond the limits of his expertise and the case facts before him and falls into the realm of impermissible speculation. Also, several of Dr. Finley's opinions should also be struck as unhelpful to the jury in light of their disconnect from the case facts. All these failures require excluding, or at least limiting, his opinions under the Court's gatekeeping role.

## II. Legal Standard

As the party offering Dr. Finley's testimony, Defendants bear the burden of proving all aspects of its admissibility by a preponderance of the evidence. *See E.E.O.C. v. Kaplan Higher Educ. Corp.*, 748 F.3d 749, 752 (6th Cir. 2014) (citing *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001)). As discussed in detail below, Defendants cannot meet their burden.

The Federal Rules of Evidence, particularly Rule 702, govern the admissibility of expert testimony. Rule 702 was amended in 2000 to reflect the holdings of two landmark Supreme Court opinions—*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993); and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). Rule 702 sets forth:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

*Daubert, Kumho Tire,* and their progeny direct that a district court functions as a gatekeeper and admits only expert testimony that is *both* relevant and reliable, and is tasked with ensuring the jury is insulated from irrelevant or unreliable testimony. *See Daubert*, 509 U.S. at 597; *Kumho Tire*, 526 U.S. at 147-49. *See also, e.g., In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528 (6th

Cir. 2008); *Conwood Co,. L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 792 (6th Cir. 2002) (gatekeeping is an "obligation…to exclude from trial expert testimony that is unreliable and irrelevant").

The Sixth Circuit has distilled expert admissibility into three requirements: (1) qualification, (2) reliability, and (3) relevance, or helpfulness. *See United States ex rel. Tenn. Valley Auth. v. 1.72 Acres of Land*, 821 F.3d 742, 749 (6th Cir. 2016) (citation omitted).[13] The three must be satisfied.[14] Hence, even if a court determines an expert is qualified, the expert must still clear both the other two requirements of relevance and reliability. *See In re Scrap Metal*, 527 F.3d at 529; *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994).

Relevance means the expert testimony must "fit" the facts of the case and assist the jury in its deliberations. *See Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 478 (6th Cir. 2008) (citing *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000)). And in determining the reliability of expert testimony, the court will focus on the underlying methodology and principles by reviewing several "reliability factors." Included in that inquiry are the following: the testing of a theory or technique; peer review and publication of the expert's work; standards and error rates; and general acceptance of the work in the relevant scientific community. *See Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 407 (6th Cir. 2006) (citing *Daubert*, 509 U.S. at 593-94).[15]

---

[13] "In order for an expert witness's opinion to be admissible under Rule 702 . . . (1) the witness must be qualified by knowledge, skill, experience, training, or education; (2) the testimony must be relevant, meaning that it will assist the trier of fact to understand the evidence or to determine a fact in issue; and (3) the testimony must be reliable, as assessed by its factual basis and the sufficiency of its principles and methods." *DayCab Co. v. Prairie Tech., LLC*, 67 F.4th 837, 853 (6th Cir. 2023) (cleaned up).; *Sigler v. American Honda Motor Co.*, 532 F.3d 469, 478 (6th Cir. 2008) (citing *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000)); *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 407 (6th Cir. 2006) (citing *Daubert*, 509 U.S. at 593-94).

[14] Rule 702's requirements, and the Court's gatekeeping role, apply to all expert testimony, not solely scientific expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).

[15] The four reliability factors are designed to implement "[t]he key handholds of Rule 702"—that "any relevant scientific or technical evidence must be the product of reliable principles and methods and must have been reliably applied in the case." *Gissantaner*, 990 F.3d at 463 (internal quotation marks omitted). *See Kumho Tire*, 526 U.S. at 150. The expert witness should demonstrate

Finally, the Court's gatekeeping function requires more than "taking the expert's word for it." Fed. R. Evid. 702, 2000 Committee Notes (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995) (the "experts' qualifications, their conclusions and their assurances of reliability" are "not enough" under *Daubert*)).[16]

## III. Argument

As outlined above, Dr. Finley's numerous concessions and willingness to discard the requisite scientific rigor in order to provide *ipse dixit*-type, or speculation-based, opinions that are not supported by the facts. Such opinions are impermissible and must be excluded under Rule 702.

### A. Dr. Finley Engaged in Impermissible Speculation Regarding the Basis of His Contention that the Contaminants Found on Plaintiffs' Properties Were Present Prior to, and Therefore Unrelated to, the Derailment.

In his haste to rubber stamp Arcadis' delineation findings, it is undisputed based on his deposition admissions that Dr. Finley cannot offer opinions on alternative sources of the contaminants rooted in any case facts, and that such opinions constitute impermissible speculation. And as described above at item nos. 1-5, 9, 11, 13, 15-26,[17] Dr. Finley admits he does not know

---

"the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152.

[16] With these understandings, several categories of expert testimony are usually held inadmissible: First, courts should exclude admission of expert testimony "connected to existing data only by the *ipse dixit* of the expert." *See Nelson*, 243 F.3d at 254 (citation omitted). Second, expert testimony should be excluded if it amounts to a "mere guess or speculation." *See In re Scrap Metal*, 527 F.3d at 530. Third, expert testimony will be held inadmissible when it states a legal conclusion. *See Babb v. Maryville Anesthesiologists P.C.,* 942 F.3d 308, 317 (6th Cir. 2019); *Killion v. KeHE Distribs., LLC*, 761 F.3d 574, 593 (6th Cir. 2014). Fourth, an expert cannot testify to the credibility of other witnesses. *See Smith v. Jones*, 721 Fed. Appx. 419, 423 (6th Cir. 2018) (citing *Greenwell,* 184 F. 3d at 496). Fifth, an expert witness must timely file a Rule 26(a)(2)(B) report disclosing his or her opinions; expert trial testimony must be limited to that subject matter. *See Mathis v. Roa*, 793 Fed.Appx. 367, 2019 WL 5588870, at *2 (6th Cir. Oct. 30, 2019). Sixth, "[i]f a purported expert's opinion was prepared solely for litigation, that may also be considered as a basis for exclusion." *See Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012) (citations omitted).

[17] *See supra* pp. 2-8.

what contaminants are released by an incomplete combustion event involving VCM (as occurred here) or how to conduct a fate and transport analysis to determine how the contaminants travelled from where they were released, through the environment, to Plaintiffs' properties. He nevertheless agrees that contaminants from the Derailment reached Plaintiffs' properties; that VCM, benzene, and dioxins were found on Plaintiffs' properties; and that Plaintiffs' own sampling demonstrates dioxins are still present in 2026 in excess of screening levels. Despite these facts and the gaps in his knowledge, Dr. Finley still attempts to opine that the contaminants preexisted the Derailment, even though he has no direct evidence that allows him to point to a single specific alternative source. Just as with differential analyses in causation cases, that is not allowed. When there is a contamination source present, as we have here, an expert cannot simply ignore it in order to speculate on alternative causes that have no supporting proof. Instead, he must adequately describe how he ruled-in/ruled-out the causal sources. *See Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 674 (6th Cir. 2010); *see also Best*, 563 F.3d at 179 (quoting *In re Paoli Railroad Yard PCB Lit.*, 35 F.3d 717, 759 (3d Cir. 1994)). And here, Dr. Finley cannot identify any evidence the contamination sampled on Plaintiffs' properties originates from a specific cause (or even multiple specific causes) other than the Derailment without relying on speculation. As such, Dr. Finley should be excluded from claiming these speculative "background" sources are the cause of Plaintiffs' contamination.

**B. Dr. Finley Cannot Provide an Opinion that Plaintiffs' Employees' Post-Derailment Symptoms Were Not Derailment-Related, That They Were Caused by Any Other Source, or That There Are No Long-Term Health Affects from the Derailment.**

Dr. Finley admits that every health assessment he reviewed for other VCM releases demonstrated the same acute symptoms reported by Plaintiffs' employees (even though the events which were not "apples to apples"); that he cannot show proof of alternative-source causes (i.e., ceramic fibers); and that he cannot dispute employees' adverse health claims, knowledge of their own health, or the differences of any symptoms they experienced post-Derailment (compared to

pre-Derailment).[18] Yet Dr. Finley still tries offering an opinion there are (or were) no adverse health risks posed by the Derailment and Vent and Burn contamination by relying on prohibited speculation and flawed methodology. *See* para. 5-12, 57-71. This not allowed under Rule 702.

What makes this opinion even more unacceptable is his acknowledgement that not just the National Institutes of Health ("NIH") but also Dr. Finley, himself, would need at least five years before either could state with reasonable certainty there were no long-term health effects. Furthermore, Dr. Finley admits he is not an epidemiologist. Offering this opinion, therefore, is not just speculation—it is also an opinion without a reasonably supportable methodology, or even the requisite qualifications, that flies in the face of the very health study standards which he agrees would be needed to offer such a determinative statement. Because of this, any opinions claiming a lack of health risks from the Derailment should be excluded, and the sections of his report in support of such opinions should be struck as not helpful to the jury since there would be no admissible opinion to relate to that discussion.

**C. Dr. Finley Should Not Be Permitted to Offer Rebuttal Opinions Against Drs. Rosenfeld, Larranaga, or Pritchard Because He Lacks the Requisite Expertise, Has Conceded He Did Not Review Their Materials, or Has No Basis for a Rebuttal.**

As detailed above in item nos. 1-2, 19-23, 47-49 and 72-75,[19] Dr. Finley has demonstrated that he does not have the understanding of the incomplete combustion which resulted from the Vent and Burn of VCM to rebut the opinions offered by Dr. Larranaga—opinions and deposition testimony which he admitted to no more than giving a cursory review of his opinions. Dr. Finley thus should be preluding from speculating on the same.

Similarly, Dr. Finley cannot opine on Dr. Rosenfeld's discussion of the effects of an incomplete combustion on his air modeling; cannot speculate that any of the PWS data from which

[18] *See supra* pp. 2-3, 7-8 at item nos. 5-12, 57-71.
[19] *See supra* pp. 2, 3, 6-8.

Dr. Rosenfeld gathered air data are inaccurate, because Dr. Finley never analyzed them; and cannot comment on any aspect of Dr. Rosenfeld's analysis of the community contamination levels and faults with NS's background modeling, because Dr. Finley conceded (even though it could "get [him] in trouble") that he did not review Dr. Rosenfeld's opinions or deposition testimony and did not plan to testify on them when deposed on the specifics of Dr. Rosenfeld's opinions.

Finally, as to Dr. Pritchard, Dr. Finley conceded he did not bother to review the deposition testimony or rebuttal report for Dr. Pritchard, and apparently gave only a passing review of his proffered opinions. Additionally, Dr. Finley does not have the expertise in Dr. Pritchard's field to even address his topics. But even if he did, his concessions on the employee health risks and published Human Health Surveys would fatally undermine his rebuttals. Therefore, Dr. Finley's speculative and baseless rebuttals of Drs. Pritchard, Rosenfeld, and Larranaga should be excluded.

**D. Dr. Finley Should be Precluded from Rebutting Mr. Petty's Opinions on the Source of the PFOA at CeramFab, How the Chemicals Moved Through the Environment from the Derailment to Plaintiffs' Properties, On the Plume and How it Invalidates Norfolk Southern's Background Sampling Locations, His Criticisms of Norfolk Southern's Sampling Plans and EPA Oversight, or the Legitimacy of Plaintiffs' Sampling Results.**

Just as with the other methodologically unsound opinions described above, Dr. Finley's rebuttal of most of Mr. Petty's opinions (and Dr. Finley's affirmative opinions on the same topics) should be excluded because of the overt and unescapable admissions he made during his deposition. Dr. Finley admitted that he does not know how to assess the degradation of AFFF into PFOA when used to extinguish a combustion event, as is the case here, so he cannot rebut Mr. Petty's proffered opinions on the same.[20] As previously discussed in section III.A., Dr. Finley does not understand fate and transport nor have the expertise to opine upon it, and he also has methodologic holes in his understanding of what wastes and contaminants were located at the

[20] *See supra* p. 4 at item no. 28.

Derailment site. As a result, he cannot reliably rebut Mr. Petty's analysis of how the Derailment contaminants transported to Plaintiffs' properties, nor can he reliably conduct the differential diagnosis-like evaluation he performed to determine it was more likely than not the Derailment was the source of Plaintiffs' contamination.[21] Dr. Finley, as touched upon in section III.C., has also relinquished his ability to challenge Dr. Rosenfeld and Mr. Petty on their background sampling analysis (Dr. Finley does not dispute the legitimacy of any of Mr. Petty's sampling results) and conceded the exact gaps in his methodology (not knowing where the plume went or what it distributed where) which would be necessary to rebut Plaintiffs on this topic.[22] Finally, Dr. Finley cannot opine on the sufficiency of NS's sampling plans, sampling efforts, or the adequacy or EPA's oversight of the same, because he admitted that he did not look at those materials, does not know what EPA saw or was given, cannot comment on the sampling plans, and that these topics would be "outside [his] area of expertise."[23] For these reasons, any testimony by Dr. Finley on the adequacy of NS's sampling plans or EPA's oversight and involvement should be excluded as being outside his area of expertise and based on speculative and *ipse dixit* statements—all prohibited foundations for expert opinions under Rule 702.

## IV. Conclusion

As set forth above, Plaintiffs respectfully request that the Court exclude Dr. Finley's opinions as detailed herein.

Respectfully submitted, this 8th day of September 2026.

*/s/ Jon C. Conlin*__________________
Jon C. Conlin (AL Bar No. 7024-J66C)
R. Andrew Jones (AL Bar No. 0096-I11R)
Hunter M. Phares (AL Bar No. 5406-G38V)

[21] *See supra* pp. 2-7 at item nos. 1-5, 9, 11, 13, 15-27, 39-51; *see also* Exhibit I (Deposition of Mr. Stephen Petty, June 23, 2026), at 47:23-50:6; 51:11-55:2; 266:16-267:16.
[22] *See supra* pp. 2-9 at item nos. 1-4, 19-23, 27, 47-51, 72, 74.
[23] *See supra* p. 7 at item nos. 54-56.

James E. Cory (Admitted *Pro Hac Vice*)
CORY WATSON, P.C.
2131 Magnolia Avenue S.
Birmingham, AL 35205
Phone: (205) 328-2200
Fax: (205) 324-7896
jconlin@corywatson.com
ajones@corywatson.com
hphares@corywatson.com
jcory@corywatson.com

*Counsel for Plaintiffs*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing complies with the 15-page limitation of Local Rule 7.1(f) and the formatting requirements of Local Rule 10.1.

This 8th day of September 2026

*/s/ Jon C. Conlin*_________________

**CERTIFICATE OF SERVICE**

I hereby certify that I filed a true and correct copy of the foregoing via the Court's CM/ECF system, which will send electronic notice to all counsel of record.

This 8th day of September 2026

*/s/ Jon C. Conlin*_________________