**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CERAMFAB, INC. et al.,<br><br>Plaintiffs,<br><br>v.<br><br>NORFOLK SOUTHERN CORPORATION et al.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 4:23-cv-02206-BYP<br><br>JUDGE BENITA Y. PEARSON |

**PLAINTIFFS' MOTION TO EXCLUDE THE OPINIONS OF ADAM LOVE**

Pursuant to the Court's Case Management Order [ECF No. 36], Plaintiffs move to exclude or limit the testimony and opinions at trial of Dr. Adam Love ("Dr. Love"), whom Defendants Norfolk Southern Corp, et al. (collectively, "Defendants" or "Norfolk Southern"), retained as their expert and who issued a report and provided sworn deposition testimony.

As set forth in the memorandum, Dr. Love's opinions do not meet the standards as set by Rule 702. The Court should therefore order this expert's testimony and opinions to be limited or excluded.

*/s/ Jon C. Conlin*__________________
Jon C. Conlin (AL Bar No. 7024-J66C)
R. Andrew Jones (AL Bar No. 0096-I11R)
Hunter M. Phares (AL Bar No. 5406-G38V)
James E. Cory (Admitted *Pro Hac Vice*)
CORY WATSON, P.C.
2131 Magnolia Avenue S.

Birmingham, AL 35205
Phone: (205) 328-2200
Fax: (205) 324-7896
jconlin@corywatson.com
ajones@corywatson.com
hphares@corywatson.com
jcory@corywatson.com

*Counsel for Plaintiffs*

**PLAINTIFFS' MEMORADUM IN SUPPORT OF MOTION TO EXCLUDE THE OPINIONS OF ADAM LOVE**

## I. Introduction and Background

Dr. Love was employed by Norfolk Southern to provide testimony rebutting the opinions of Plaintiffs' experts[1]: *Dr. David Pritchard* (regarding the reasonableness of contamination-related concerns and decision making, like Mr. Wang's, after an environmental disaster like the Derailment, Vent and Burn, and resulting contamination in this case)[2]; *Mr. Stephen Petty* (regarding the contaminants released from the Derailment and related incomplete combustion event, the contamination on and around Plaintiffs' properties, the source of that contamination, problems with Norfolk Southern's claimed background levels, the actual background dioxin levels, the Fate and Transport of the chemicals released during the Derailment-related events, the incomplete combustion plume deposition from the Vent and Burn, Norfolk Southern's sampling and sample results, EPA oversight concerns, and limitations/inaccuracies contained in Arcadis' sampling and delineation report)[3]; *Dr. Paul Rosenfeld* (regarding the air and plume modeling from the Vent and Burn, the direction of the plume from the burn, how incomplete combustion events like in this case manifest and what contaminants (i.e. dioxins) form from them, how and where the plume deposited the contaminants (i.e. dioxins), problems with Norfolk Southern's claimed background levels, the actual background dioxin levels, the contaminants on and around Plaintiffs' properties, and the

---

[1] *See* Exhibit A (May 15, 2026, Expert Report of Adam Love), at iv-vi (executive summary); *see generally* Exhibit B (July 20, 2026, Deposition of Adam Love).
[2] *See* Exhibit A (Love Rpt.), at 138-40. *Cf.* Exhibit C (April 6, 2026, Expert Report of Dr. David Pritchard); Exhibit D (May 29, 2026, Expert Rebuttal Report of Dr. David Pritchard).
[3] *See* Exhibit A (Love Rpt.), at 70-73, 94-96, 120-30, 135-38. *Cf.* Exhibit E (April 6, 2026, Expert Report of Mr. Stephen Petty); Exhibit F (May 29, 2026, Expert Rebuttal Report of Mr. Stephen Petty).

source of those contaminants)[4]; and *Mr. Barry Runk* (regarding the costs of remediation and replacement at Plaintiffs' two East Palestine properties).[5]

Dr. Love also opines on the quality of Norfolk Southern's air sampling around Plaintiffs' properties, and the accuracy of Arcadis' sampling methods and delineation determinations, and further that the Derailment- and Vent and Burn-related releases of contaminants, including dioxin and vinyl chloride monomer ("VCM"), in the context of the impacted area's geology and hydrogeology, do not support the health effects reported in this case.[6]

For the scope of his opinions, Dr. Love relies on select case materials and deposition transcripts provided by defense counsel, and his own professional qualifications and experiences.[7]

Notably, Dr. Love is not basing his opinions on any meetings or conversations with any individuals who were on the ground about any of the facts or circumstances surrounding the Derailment; Plaintiffs, their properties, their businesses, or their employees; the sampling sources and instruments employed by Plaintiffs' experts; EPA action;, or the specific events on which he seeks to opine.[8, 9] He is, therefore, limited to his listed reliance materials to form the basis of his opinions under Rule 702. This is a problem for many of the opinions Dr. Love tries to provide rebutting Plaintiffs' experts or the affirmative opinions identified above and covered in detail

---

[4] *See* Exhibit A (Love Rpt.), at 70-73, 94-96, 102-119. *Cf.* Exhibit G (April 6, 2026, Expert Report of Dr. Paul Rosenfeld); Exhibit H (Expert Rebuttal Report of Dr. Paul Rosenfeld).
[5] *See* Exhibit A (Love Rpt.), at 140-44. *Cf.* Exhibit I (April 6, 2026, Expert Report of Mr. Barry Runk); Exhibit J (Expert Rebuttal Report of Mr. Barry Runk).
[6] *See* Exhibit A (Love Rpt.), at 37, 74, 98, 102, 120, 130.
[7] *See id.* at 1, Appendix C.
[8] *See* Exhibit B (Love Dep.), at 101:3-101:6; 119:1-120:13; 207:24-208:9; 141:9-141:13.
[9] As discussed in more detail below, Dr. Love was retained by Defendants to assist or consult with the remediation efforts in a litigation capacity and claimed privilege with respect to any questions involving that work. Therefore, any communications he may or may not have had during that period could not be the basis of any expert opinions he wishes to offer here. *Id.* at 17:14-18:16; 20:3-20:12; 76:9-78:9; 81:7-81:12; 83:2-83:15; 213:4-214:18.

throughout his report.[10] When pressed during his deposition, Dr. Love made numerous concessions and acknowledged certain facts that undermine the foundation of his opinions:

**Concerning the limitations of his expertise and the resulting limitations of his purported rebuttals of Dr. Pritchard, Mr. Petty, Dr. Rosenfeld, and Mr. Runk regarding human health risks and the reasonableness of Plaintiffs' concerns about the risks of contamination and needing adequate site remediation—**

1. Despite repeatedly opining that there was and is no potential for human health risk from the Derailment-related contamination (Exhibit A (Love Rpt.), at 37, 42, 44, 47, 51, 60-61, 63, 65, 67, 69, 71, 73-74, 78, 81, 85, 94-96, 120, 127-130, 140-143) to "rebut" Plaintiffs' experts' opinions on the reasonableness of Plaintiffs' ongoing concerns regarding potential health effects and their impact on Plaintiffs' ability to safely operate their businesses in East Palestine, Dr. Love did no actual analysis or study of the human health risks in East Palestine. *See* Exhibit B (Love Dep.), at 42:5-42:22;
2. Despite agreeing that the Vent and Burn was an incomplete combustion event that could release dioxins, he does not know what dioxin levels might be and never reviewed data on the dioxin release levels on which to base his opinions. *Id.*at 43:6-45:16; 70:21-72:9;
3. Even if he did know dioxin release levels, Dr. Love does not know if dioxins are known to be toxic or carcinogenic to humans. *Id.* at 45:17-47:3;
4. Dr. Love is not a toxicologist, not an epidemiologist, and does not "evaluate the specifics of the human health risk associated with carcinogenic outcomes of dioxin exposure" (or exposure from any contaminant) except by "comparisons of environmental data with health-based screening levels." *Id.* at 47:4-47:15; 48:6-48:17; 120:2-121:17; 123:21-124:15;
5. He made no attempts to focus on the human health impacts of the PFOA (a type of PFAS) found on Plaintiffs' property that was released from the aqueous film-forming foam ("AFFF") used to fight the Derailment fires, and he cannot even state to a reasonable degree of certainty where the PFOA came from. *Id.*at 89:9-90:6; 94:6-95:10;
6. Despite challenging the reasonableness of Mr. Wang's anxieties concerning being able to safely operate Plaintiffs' businesses after the Derailment and Plaintiffs' employees reporting Derailment-related adverse health symptoms, Dr. Love is not a psychologist, psychiatrist, human factors expert, or medical doctor and has never taught, published, or conducted studies on any of those mental impression fields. *Id.* at 126:5-127:2;
7. Despite opining in his report that Plaintiffs' properties were no longer contaminated, he agrees Petty's March 19, 2026, sampling shows 15.9 parts per trillion ("ppt") of dioxins at CeramFab, which is three-times higher than the regional screening level ("RSL") for cancer (4.8 ppt). *Id.* at 270:9-273:1;
8. Despite opining in his report that Plaintiffs' properties were no longer contaminated, he also agrees Petty's March 19, 2026, sampling shows 60 ppt of dioxins at WYG, which is 12-times higher than the RSL for cancer (4.8 ppt), three-times higher than the Norfolk Southern's background threshold level ("BTL") (18 ppt), and 1.2-times higher than the EPA screening level that triggers further investigation and remediation (51 ppt). *Id.*;

[10] *See* Exhibit A (Love Rpt.).

9. Despite opining that Plaintiffs' properties are not contaminated based on Arcadis and Norfolk Southern delineation statements, Dr. Love admitted that "[i]f the question is what is the contamination at a property, measuring the amount of contamination at the property is the most direct way to get that answer." *Id.* at 115:6-115:14;
10. Even with these elevated readings in Norfolk Southern's possession, the company made no attempts to inform/update the EPA because Norfolk Southern only focused on the immediate Derailment area and never endeavored to even test the soil at WYG property to establish it was not contaminated despite a three-year pending lawsuit claiming it was. *Id.* at 274:13-276:14;
11. Despite opining that both Plaintiff sites were fully remediated and/or not contaminated, he admitted that no soil sampling or remediation was ever performed by Norfolk Southern under the slabs of either building. *Id.* at 190:19-192:192:12;
12. He did no evaluation of whether either of Plaintiffs' properties could ever be repurposed after the Derailment contamination and in light of current sampling results, and does not know what that would entail, what the costs of any remediation would be, and cannot offer any opinion on the subject. *Id.* at 193:12-196:9.

**Concerning background sampling and his knowledge of where the plume went or where the plume deposited the contaminants it carried—**

13. That the Vent and Burn plume carried contaminants and that it spread at least through the night of February 6-7, 2023. *Id.* at 62:1-67:9;
14. He agrees the plume was carrying soot/ash, but he does not know where that soot/ash went or was deposited and made no attempts to determine where. *Id.*;
15. He agrees plume soot/ash was reported on Plaintiffs' properties. *Id.* at 116:24-117:6, 118:6-118:22;
16. When rebutting Rosenfeld's opinions and air modeling—including his use of Personal Weather Station ("PWS") derived data—Dr. Love did nothing to inspect or refute the accuracy of PWS derived data and cannot state what Dr. Rosenfeld did regarding the same. *Id.* at 139:24-143:22;
17. When rebutting Rosenfeld's opinions and air modeling—including the dioxin sampling results that validated his modeling—Dr. Love conceded that analytical testing results would be the best evidence as to the accuracy. *Id.* at 115:6-115:14, 254:13-255:1, 260:8-260:16.

**Concerning his inability to validate Norfolk Southern's/Arcadis' determination (speculation) of where the contaminants found on CeramFab originated or how contaminants on either property would be from other non-Derailment sources as claimed in the delineation report and his own Report—**

18. Despite agreeing with Arcadis' delineation report determination that coal deposits were a source for the benzene and other PAH contaminants found on the CeramFab property (Exhibit A (Love Rpt.), at 7, 32, 70, 101, and 136), Dr. Love reversed himself in his deposition by admitting that he saw no evidence, including sampling, of any coal seams below Plaintiffs' properties. Exhibit B (Love Dep.), at 138:9-139:23;

19. When discussing Arcadis' delineation report claims that safety data sheets ("SDSs") supported its determination that benzene and VCM readings at CeramFab were not from the Derailment, Dr. Love never saw proof that any SDS was ever actually reviewed by Arcadis or provided to Norfolk Southern (but conceded that Arcadis confirmed that if any SDS had been reviewed it would have been provided to Norfolk Southern), did not see any SDS for any product which was located in CeramFab or WYG, and cannot opine on what any SDS would have said for any product located at either property. *Id.* at 129:15-131:23[11];
20. When discussing Arcadis' claims in the delineation report that cleaning products were a source of contaminant findings at CeramFab, he saw no evidence that any sampling was ever done on any cleaning product to determine the presence or levels of benzene or VCM in them and did no independent analysis of the products to make that determination himself. *Id.* at 127:3-128:21;
21. When discussing Arcadis' delineation report claims that any benzene was likely from gas/petroleum product use, he saw no evidence of MTBE in any samples at Plaintiffs' properties or at the Derailment site despite acknowledging MTBE being a component of petroleum/gas/diesel products. *Id.* at 158:12-160:4, 160:21-163:3;
22. He saw no evidence in anything he reviewed which showed that any specific petroleum source was identified as an alternative causal source of benzene or other PAHs on Plaintiffs' properties and he never made any attempt of his own to determine a specific source. *Id.*;
23. Despite supporting Arcadis' delineation report determination that the dioxin results were preexisting "background" and not from the Derailment, Dr. Love agreed there was only a single homogenized sample ever collected at the CeramFab property by Norfolk Southern (and none at WYG), that homogenizing or compositing samples (as Norfolk Southern did at CeramFab with that single sample) dilutes elevated readings, thereby preventing him from knowing the highest levels; and that he never analyzed the full dioxin profile from the Vent and Burn release. *Id.* at 43:6-45:16; 70:21-72:9; 113:6-113:19; 154:5-156:10;
24. Despite defending Arcadis' delineation report claim that all contaminants were remediated, he admits there were no dioxin soil samples taken other than the early homogenized composite sample and Norfolk Southern did not conduct soil testing in 2026 despite getting Plaintiffs' approval to do so (only air samples were taken by Defendants in 2026). *Id.* at 114:5-115:14, 116:13-116:23;
25. Despite defending Arcadis' delineation report claim that all contaminants were remediated, Dr. Love admits (as noted earlier) that Petty's sampling shows 15.9 ppt of dioxins at CeramFab and 60 ppt at WYG from March 19, 2026, sampling, and that these results are respectively three-times higher and 12-times higher than the RSL for cancer (4.8 ppt). *Id.* at 270:9-273:1;
26. Despite supporting Arcadis' delineation report determination that the dioxin results were not from the derailment, Dr. Love agreed he was aware of reports there was ash/soot from the vent and burn's incomplete combustion event deposited on Plaintiffs' property and he could not offer an opinion to negate its presence (along with all the contaminants that soot/ash would indicate). *Id.* at 116:24-117:6, 118:6-118:22;

[11] This lack of any supporting SDS production, and how any SDS review would have resulted in a SDS production, was confirmed by both Arcadis' Rule 30(b)(6) representative and through written correspondence by Norfolk Southern's counsel.

27. Despite supporting Arcadis' delineation report determination that the dioxin results were not from the Derailment, Dr. Love agreed no dioxin or VCM forensic analysis—or "fingerprinting"—was performed by Arcadis or Norfolk Southern (despite it being technologically feasible) even though that would have allowed specific identification of the source in order to rule in/out the Derailment. *Id.* at 75:17-76:7; 84:22-87:3;
28. Despite supporting Arcadis' delineation report determination that the benzene, VCM, and other contaminant sampling results were not from the Derailment, Dr. Love agreed that there were exceedances of those chemicals at the Derailment site (*Id.* at 163:5-166:5, 170:10-171:24); that subsurface water movement is to the West/Southwest at that location with a clay barrier acting as a "contamination barrier" that would keep the contaminants from drifting lower (thus allowing them to move laterally) (*Id* at 164:1-164:14, 169:23-170:7, 185:15-186:2); that both CeramFab and WYG are to the West/Southwest of the Derailment site, as is Sulfur Run creek); that VCM was found in the creeks and subsurface groundwater (*Id.* at 183:22-184:19); and that he did no analysis of what contaminants were in Sulfur Run despite his understanding that it runs under WYG (*Id.* at 184:20-185:14).

**Concerning the lack of a sufficient basis for his opinion about EPA oversight or the reasonableness of Norfolk Southern's sampling plans and sampling activities—**

29. Despite wishing to opine that EPA oversaw and reviewed all of Norfolk Southern's East Palestine-related sampling and testing, Dr. Love conceded that he does not know what agreement EPA had with Norfolk Southern regarding sample reviews or if all sampling results were shared with EPA or were supposed to be shared with EPA. *Id.* at 74:2-75:15; 133:1-133:21; 165:13-136:6;
30. Despite wishing to opine that EPA oversaw and reviewed all of Norfolk Southern's East Palestine-related work plans, Dr. Love conceded he does not know what plans were provided to EPA, if everything related to the plans was provided to EPA, if EPA was aware of Norfolk Southern's sample homogenization efforts, if EPA was aware of any work plan violations/irregularities by Norfolk Southern, what percentage of samples EPA reviewed, or even how many sampling efforts EPA directly oversaw. *Id.* at 202:9-219:7;
31. Despite wishing to opine on the reasonableness of Norfolk Southern's East Palestine-related sampling efforts, Dr. Love could not even identify the number of soil samples taken by Defendants and their contractors. *Id.* at 211:9-211:24;
32. When asked how many soil samples should be done after an event like this Derailment in order for it to be a reasonable sampling and remediation effort, Dr. Love admitted he did not develop any such plan and could not give an opinion on what would be reasonable. *Id.* at 212:4-214:18[12];
33. When questioned about Norfolk Southern's sampling plan changes, or his contemporaneous recommendations during his own involvement as a hired consultant for Norfolk Southern during the post-Derailment remediation period on what should be sampled and how the sampling should be conducted, or even if Norfolk Southern was

[12] ("**Q.** If you wanted to get a good picture of the contaminants in the soil in and around East Palestine for an event like this, wouldn't you agree that the total number of samples should be in excess of a thousand that were performed by Arcadis? . . . **A.** Again, I haven't developed the sampling plan for—an independent sampling plan on the delineation on my own.").

reasonable in how it developed and followed its own plans, Dr. Love claimed privilege at the direction of Norfolk Southern's lawyers and refused to answer. *Id.* at 17:14-18:16; 20:3-20:12; 76:9-78:9; 81:7-81:12; 83:2-83:15; 213:4-214:18.

These significant limitations and concessions, including limitations flowing from the narrow scope provided by Norfolk Southern, Dr. Love's own lack of experience, and his strategic efforts to hide behind privilege, demonstrate that Dr. Love failed to follow a reasonable methodology, with pure speculation being the basis of his opinions. Dr. Love's desired testimony ventures well beyond the limits of the case facts before him and instead falls into the realm of impermissible conjecture. Additionally, several of Dr. Love's affirmative and rebuttal opinions should also be excluded as unhelpful to the jury in light of their disconnect from the case facts. All these failures require excluding his opinions under the Court's gatekeeping role.

## II. Legal Standard

As the party offering Dr. Love's testimony, Defendants bear the burden of proving all aspects of its admissibility by a preponderance of the evidence. *See E.E.O.C. v. Kaplan Higher Educ. Corp.*, 748 F.3d 749, 752 (6th Cir. 2014) (citing *Nelson v. Tenn, Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001)). As discussed in detail below, Defendants cannot meet their burden.

The Federal Rules of Evidence, particularly Rule 702, govern the admissibility of expert testimony. Rule 702 was amended in 2000 to reflect the holdings of two landmark Supreme Court opinions—*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993); and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). Rule 702 sets forth:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

*Daubert, Kumho Tire,* and their progeny direct that a district court functions as a gatekeeper and admits only expert testimony that is *both* relevant and reliable, and is tasked with ensuring juries are insulated from inadmissible expert testimony. *See Daubert*, 509 U.S. at 597; *Kumho Tire*, 526 U.S. at 147-49; *see also, e.g., In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528 (6th Cir. 2008); *Conwood Co. L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 792 (6th Cir. 2002) (gatekeeping is an "obligation . . . to exclude from trial expert testimony that is unreliable and irrelevant").

The Sixth Circuit has distilled expert admissibility into three requirements: (1) qualification, (2) reliability, and (3) relevance, or helpfulness. *See U.S. ex rel. Tenn. Valley Auth. v. 1.72 Acres of Land*, 821 F.3d 742, 749 (6th Cir. 2016) (citation omitted).[13] The three must be satisfied.[14] Hence, even if a court determines the expert is qualified, the expert must still clear both the other two requirements of relevancy and reliability. *See In re Scrap Metal*, 527 F.3d at 529; *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994).

Relevance means the expert testimony must "fit" the facts of the case and assist the jury in its deliberations. *See Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 478 (6th Cir. 2008) (citing *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000)). And in determining the reliability of expert testimony, the court will focus on the underlying methodology and principles by reviewing several "reliability factors." Included in that inquiry are the following: the testing of a theory or technique;

---

[13] "In order for an expert witness's opinion to be admissible under Rule 702 . . . (1) the witness must be qualified by knowledge, skill, experience, training, or education; (2) the testimony must be relevant, meaning that it will assist the trier of fact to understand the evidence or to determine a fact in issue; and (3) the testimony must be reliable, as assessed by its factual basis and the sufficiency of its principles and methods." *DayCab Co. v. Prairie Tech., LLC*, 67 F.4th 837, 853 (6th Cir. 2023) (cleaned up).; *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 478 (6th Cir. 2008) (citing *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000)); *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 407 (6th Cir. 2006) (citing *Daubert*, 509 U.S. at 593-94).

[14] Rule 702's requirements, and the Court's gatekeeping role, apply to all expert testimony, not solely to scientific testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).

peer review and publication of the expert's work; standards and error rates; and general acceptance of the work in the relevant scientific community. *See Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 407 (6th Cir. 2006) (citing *Daubert*, 509 U.S. at 593-94).[15]

Finally, the Court's gatekeeping function requires more than "taking the expert's word for it." Fed. R. Evid. 702, 2000 Committee Notes (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995) (the "experts' qualifications, their conclusions and their assurances of reliability" are "not enough" under *Daubert*)).[16]

## III. Argument

As outlined above, Dr. Love's numerous concessions and willingness to dispose of the requisite scientific rigor in order to provide *ipse dixit*-type, or speculation-based, opinions that are not supported by the facts. These opinions are impermissible and should be excluded under Rule 702.

---

[15] At bottom, the four reliability factors are designed to implement "[t]he key handholds of Rule 702"—that "any relevant scientific or technical evidence must be the product of reliable principles and methods and must have been reliably applied in the case." *Gissantaner*, 990 F.3d at 463 (internal quotation marks omitted). *See Kumho Tire*, 526 U.S. at 150. The expert witness should demonstrate "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152.

[16] With these understandings, several categories of expert testimony are usually held inadmissible: (1) Courts should exclude admission of expert testimony "connected to existing data only by the *ipse dixit* of the expert." *See Nelson*, 243 F.3d at 254 (citation omitted). (2) Expert testimony should be excluded if it amounts to a "mere guess or speculation." *See In re Scrap Metal*, 527 F.3d at 530. (3) Expert testimony will be held inadmissible when it states a legal conclusion. *See Babb v. Maryville Anesthesiologists P.C.,* 942 F.3d 308, 317 (6th Cir. 2019); *Killion v. KeHE Distribs*., *LLC*, 761 F.3d 574, 593 (6th Cir. 2014). (4) An expert cannot testify to the credibility of other witnesses. *See Smith v. Jones*, 721 Fed. Appx. 419, 423 (6th Cir. 2018) (citing *Greenwell,* 184 F. 3d at 496). (5) An expert witness must timely file a Rule 26(a)(2)(B) report disclosing his or her opinions; expert trial testimony must be limited to that subject matter. *See Mathis v. Roa*, 793 Fed.Appx. 367, 2019 WL 5588870, at *2 (6th Cir. Oct. 30, 2019). (6) "If a purported expert's opinion was prepared solely for litigation, that may also be considered as a basis for exclusion." *See Newell Rubbermaid, Inc. v. Raymond Corp*., 676 F.3d 521, 527 (6th Cir. 2012) (citations omitted).

**A. Dr. Love Engaged in Impermissible Speculation Regarding the Basis of His Contention that the Contaminants Found on Plaintiffs' Properties Were Present Prior to, and Therefore Unrelated to, the Derailment.**

In Norfolk Southern's drastic effort to prop-up Arcadis' highly speculative delineation report findings, it is undisputable, based on the admissions above, that Dr. Love cannot offer opinions on an alternative source of the contaminants found on Plaintiffs' property that is in any way rooted in the facts of this case. Similarly, Dr. Love cannot support the speculative determinations reached by Arcadis without himself engaging in baseless conjecture that is prohibited by Rule 702.

Here, as detailed above in items 7-11 and 18-28,[17] Dr. Love admits contamination from the Derailment could have reached Plaintiffs' properties; that VCM, benzene, and dioxins were found on Plaintiffs' properties; and that Plaintiffs' own sampling demonstrates dioxins in excess of various screening levels are still present in 2026. Despite this, he still attempts to opine the contaminants preexisted the Derailment even though he has no direct evidence that allows him to point to a single specific alternative source—while the contaminants from the Derailment are right there. Just as with differential analyses in causation cases, that is not allowed.

When a known contamination source is present, as here, an expert cannot simply ignore it in order to speculate on alternative causes that have no supporting proof. Instead, he must adequately describe how he ruled-in/ruled-out the causal sources. *See Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665 (6th Cir. 2010). *See also Best*, 563 F.3d at 179 (quoting *In re Paoli Railroad Yard PCB Lit.*, 35 F.3d 717, 759 (3d Cir. 1994)). And here, Dr. Love is unable to establish there is any evidence that the contamination sampled on Plaintiffs' properties is from a specific cause or source (or even multiple specific causes/sources) other than the Derailment without relying on speculation. Dr. Love even

---

[17] *See supra* pp. 3-6.

admitted that he has no scientific basis to support any of the specific Arcadis alternative source assumptions from the delineation report because he never saw any evidence that would support those claims and in certain instances, as with Arcadis' claims involving coal as a source, he even contradicted his own report by admitting this made-up alternative source did not exist at or under Plaintiffs' properties. This sort of *ipse dixit* rubber stamping of the Arcadis delineation report findings is not just bad science, it is a collection of prohibited expert opinions under *Daubert* and its progeny.

As such, Dr. Love should be excluded from claiming these speculative preexisting "background" sources are the cause of Plaintiffs' contamination, and from offering any opinion that Arcadis' delineation report correctly ruled out the Derailment as a source of the contaminants found on Plaintiffs' properties through both Norfolk Southern's sampling and Plaintiffs' sampling.

**B. Dr. Love Cannot Provide an Opinion that Plaintiffs' Employees' Post-Derailment Symptoms Were Not Derailment Related, That They Were Caused by Any Other Source, That There Are No Long-Term Health Risks from the Derailment, or that Plaintiffs Were Not Reasonable to be Concerned.**

Despite acknowledging that he conducted no health risk assessment, is not an epidemiologist, is not a toxicologist, and does not know the full extent of the dioxins which were released, among other failings discussed above—Dr. Love still tries offering an opinion there are (or were) no adverse health risks tied to the Derailment's and Vent and Burn's contamination by relying on prohibited speculation and flawed methodology and then using this as a basis to go far beyond his expertise by providing mental health (i.e., psychological) opinions on the reasonableness of Plaintiffs' fear and concerns.[18] This not permitted under Rule 702.

Furthermore, Dr. Love was forced to concede during his deposition that *both* properties *still* (in 2026) have dioxin readings in excess of EPA cancer screening levels and that the WYG

[18] *See supra* pp. 3-4 (item nos. 1-12).

property readings are above all cancer, commercial, and background screening levels.[19] For Dr. Love to make such concessions while simultaneously opining it is not reasonable for Plaintiffs to be worried about the post-Derailment contamination health risks that resuming operations in East Palestine would entail mean that opinion testimony fails on its face under Rule 702—even without considering Dr. Love's even more damning lack of necessary qualifications.

Dr. Love is offering a mental health/psychology opinion of Plaintiffs by stating what should be psychologically reasonable for a businessman put in Mr. Wang's position after seeing the news stories, sampling results, symptomatic employees, and contradictory statements on the "safety" of East Palestine over the last forty-three months. But Dr. Love is doing so without possessing any expertise in psychology, psychiatry, human factors analysis, medicine, or media exposure analysis (such as Plaintiffs' expert, Dr. Pritchard); and he has never taught, published, or conducted studies in any of these fields.[20] Without having the requisite training in those fields, especially in conjunction with his other concessions on the contaminant sampling results from Plaintiffs' properties, Dr. Love goes far outside the area of his expertise and his qualifications when offering these "lack of reasonableness" opinions. The Court should exercise its gatekeeper role and exclude these opinions for trial.

Hence, Dr. Love's "no health risk" and "not reasonable" opinions are not just impermissible speculation—they are opinions without any reasonably supportable methodology. Relatedly, since Dr. Love is effectively offering an epidemiology opinion as well as media and mental-health opinions but is not an actual epidemiologist nor a mental health or media expert, these opinions are also inadmissible because of his lack of qualifications. Any opinions claiming a lack of health

---

[19] *Id.*
[20] *See, e.g.*, Exhibit B (Love Dep.), at 126:5-127:2.

risks from the Derailment or that Plaintiffs' past, present, and future worries are unreasonable should be excluded and these entire sections of Dr. Love's report should be struck as not helpful to the jury since there would be no opinion to tether that discussion once the opinion is excluded.

### C. Dr. Love Should Not Be Permitted to Offer Any Opinion that EPA's Involvement in Overseeing the East Palestine Remediation Efforts Absolves Norfolk Southern of Remediation Failures, Concludes that Norfolk Southern's Sampling and Remediation Plans Were Reasonable and Sufficient, or Validates the Findings in Arcadis' CeramFab Delineation Report.

As detailed in item nos. 18-33,[21] Dr. Love has demonstrated that he does not know (1) what agreement EPA had with Norfolk Southern regarding sample reviews, (2) if all sampling results were shared with EPA or were even supposed to be shared with EPA, (3) what remediation and sampling plans were provided to EPA, (4) if everything related to the plans was provided to EPA, (6) if EPA was aware of Norfolk Southern's sample homogenization efforts, (7) if EPA was aware of any work plan violations or irregularities by Norfolk Southern, (8) what percentage of samples EPA reviewed, (9) how many sampling efforts EPA directly oversaw, (10) the number of soil samples taken by Norfolk Southern and its contractors, (11) or even what would be reasonable plan if he created it for EPA. Despite that, he still attempts to offer opinions that "Arcadis's work was reviewed and approved by US EPA" and that "sampling plans developed by Norfolk Southern were consistent with the standard of practice in the environmental industry, and were consistent with US EPA guidance documents for the Remedial Investigation process under CERCLA." He further opines that the foregoing should in some way shield Norfolk Southern or validate any spurious determinations Arcadis made in its delineation report, despite Dr. Love not knowing all the specifics enumerated above.

[21] *See supra* pp. 4-6.

So, while these EPA-approval opinions would certainly be one of many fertile grounds for Dr. Love to be eviscerated in cross at trial, they should still be excluded because he admitted he does not know what EPA saw, what EPA did not see, what agreements EPA had with Defendants, or even to what extent EPA received and reviewed the sampling. It already is understood that neither Dr. Love or any expert can offer an opinion on what EPA "understood" or knew because he cannot opine on the subjective knowledge of another actor (especially since he has not disclosed having worked at EPA or spoken with anyone at EPA about this incident). But Dr. Love also cannot speculate on what EPA knew or did not know about this particular event when Dr. Love made the decision not to bother informing himself about those particulars before providing his deposition testimony. By definition, this amounts to prohibited speculation that—absent repeated detailed instruction by the Court explaining the limitations of Dr. Love's EPA testimony at each turn—would leave the jury inferring EPA's involvement meant something more than what Dr. Love can actually opine that he knows.

As such, any attempted opinions by Dr. Love that EPA's involvement meant Norfolk Southern or Arcadis acted reasonably in their remediation efforts or that their CeramFab delineation report was substantiated or accurate should be excluded as speculative, methodologically unsound, and as not helpful to the jury.

## IV. Conclusion

As set forth above, Plaintiffs respectfully request that the Court exclude Dr. Love's opinions as detailed herein.

Respectfully submitted, this 8th day of September 2026.

*/s/ Jon C. Conlin*__________________
Jon C. Conlin (AL Bar No. 7024-J66C)
R. Andrew Jones (AL Bar No. 0096-I11R)
Hunter M. Phares (AL Bar No. 5406-G38V)

James E. Cory (Admitted *Pro Hac Vice*)
CORY WATSON, P.C.
2131 Magnolia Avenue S.
Birmingham, AL 35205
Phone: (205) 328-2200
Fax: (205) 324-7896
jconlin@corywatson.com
ajones@corywatson.com
hphares@corywatson.com
jcory@corywatson.com

*Counsel for Plaintiffs*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing complies with the 15-page limitation of Local Rule 7.1(f) and the formatting requirements of Local Rule 10.1.

This 8th day of September 2026

*/s/ Jon C. Conlin*_________________

**CERTIFICATE OF SERVICE**

I hereby certify that I filed a true and correct copy of the foregoing via the Court's CM/ECF system, which will send electronic notice to all counsel of record.

This 8th day of September 2026

*/s/ Jon C. Conlin*_________________